# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAVALE BURNS and DAVID W. TAYLOR, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>v.<br><br>UP FINTECH HOLDING LIMITED, TIANHUA WU, and JOHN FEI ZENG,<br><br>     Defendants. | Case No. 1:24-cv-01632-JGLC-RFT |

# FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff David W. Taylor ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by UP Fintech Holding Limited ("UP Fintech" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and/or entities who purchased or acquired the Company's securities between April 29, 2020 and May 16, 2023, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      UP Fintech claims to be a leading integrated financial technology platform providing cross-market, multi-product investment experience for investors around the world. The Company claims to primarily operate a one-stop digital brokerage platform, which serves as a gateway for retail and corporate clients.

3.      UP Fintech purports to offer comprehensive brokerage services through its integrated single-account structure, which it claims empowers users in trade execution, margin financing, and securities lending across different global markets. The Company claims to generate revenue primarily by charging its customers commission fees for trading of securities as well as earning interest income or financing service fees arising from, or related to, margin financing and securities borrowing and lending transactions provided to its customers for trading activities.

1

4.     During the Class Period, Defendants made numerous false and misleading misrepresentations and half-truths regarding the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or half-truths that: (1) UP Fintech's business was engaged in illegal conduct as it related to operations in China as a result of its failure to obtain the proper licenses; (2) it did not fully disclose to investors that it was engaging in unlawful activity and instead characterized the applicable Chinese laws as ambiguous; (3) the foregoing subjected the Company to a heightened risk of regulatory enforcement; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

7.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

8.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

9.      As set forth in the previously filed certification which is incorporated by reference herein (Dkt. # 36-2), Plaintiff purchased the Company's securities during the Class Period and has been damaged thereby.

10.     Defendant UP Fintech is incorporated in the Cayman Islands and has its principal places of business in Beijing, People's Republic of China ("China") and in Singapore. UP Fintech's American Depositary Shares ("ADS" or "ADSs") trade on the NASDAQ exchange under the ticker symbol "TIGR."

11.     Defendant Tianhua Wu ("Wu") has served as UP Fintech's Chief Executive Officer ("CEO") and as a Director since January 2018.

12.     Defendant John Fei Zeng ("Zeng") has served as the Company's Chief Financial Officer ("CFO") and as a Director since October 2018.

13.     Defendants Wu and Zeng are collectively referred to herein as the "Individual Defendants." Defendant UP Fintech and the Individual Defendants are collectively referred to herein as "Defendants."

14.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company. Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate

officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

15.    The Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

16.    The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

17.    The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose securities were, and are, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business

4

prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's securities by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's securities; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its securities, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's securities at artificially inflated prices.

**SUBSTANTIVE ALLEGATIONS**

19.     UP Fintech claims to be a leading integrated financial technology platform providing cross-market, multi-product investment experience for investors around the world. The Company purports to primarily operate a one-stop digital brokerage platform, which serves as a gateway for retail and corporate clients.

20.     UP Fintech claims to offer comprehensive brokerage services through its integrated single-account structure, which it claims empowers users in trade execution, margin financing, and securities lending across different global markets. The Company purports to generate revenue primarily by charging its customers commission fees for trading of securities as well as earning interest income or financing service fees arising from, or related to, margin

financing and securities borrowing and lending transactions provided to its customers for trading activities.

21.    On April 29, 2020, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2019 (the "2019 Annual Report").  Attached to the 2019 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Wu and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

22.    The 2019 Annual Report contained the following risk disclosures regarding the Company's unlicensed operations in China:

> ***We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents.***
>
> We operate in a heavily-regulated industry which requires various licenses, permits and approvals in different jurisdictions to conduct our businesses. Our customers include people who live in jurisdictions where we do not have licenses issued by the local regulatory bodies. ***It is possible that authorities in those jurisdictions may take the position that we are required to obtain licenses or otherwise comply with laws and regulations which we believe are not required or applicable to our business activities. If we fail to comply with the regulatory requirements, we may encounter the risk of being disqualified for our existing businesses or being rejected for renewal of our qualifications upon expiry by the regulatory authorities as well as other penalties, fines or sanctions.*** In addition, in respect of any new business that we may contemplate, we may not be able to obtain the relevant approvals for developing such new business if we fail to comply with the relevant regulations and regulatory requirements. As a result, we may fail to develop new business as planned, or we may fall behind our competitors in such businesses.
>
> In addition, a significant portion of our technology research and development, management, supporting and other teams are based in China and substantially all of our customers are Chinese speaking people including PRC citizens. Our PRC subsidiaries and VIEs work closely with and provide significant supporting

services for our trading platform outside of China as well as teams in New Zealand, Hong Kong, Singapore, the United States and Australia.

***In the opinion of our PRC legal counsel, our current supporting activities in China do not require a securities brokerage license or permit under the existing PRC securities laws and regulations. However, new laws and regulations in connection with our business activities may be adopted from time to time. There may be substantial uncertainties regarding the interpretation and application of current or any future PRC laws and regulations applicable to our business and that the PRC government or other governmental authorities may ultimately take a view that is inconsistent with the opinion of our PRC legal counsel.*** For instance, if certain of our activities in China were deemed by relevant regulators as provision of securities brokerage services, future brokerage services, securities or futures investment consulting services or stock option brokerage business, we might be subject to licensing requirements from the China Securities Regulatory Commission ("CSRC").

In July 2016, the CSRC posted an investor alert on its website warning investors that except for certain investment channels approved by the CSRC under the PRC laws, the CSRC has not approved any domestic or foreign institutions to provide services for domestic investors to participate in overseas securities trading. In September 2016, we received a rectification notice issued by the Beijing branch of the CSRC. Following such notice, we took certain rectification measures in order to comply with the requirements set forth therein, and we provided written responses to such authority promptly. We communicate with the Beijing branch of the CSRC from time to time to ensure our business follow their requirements. As of the date of this report, we have not received further written rectification requirements from the CSRC. For more details of the notice and our rectification measures, please see Item 4.B "Business Overview —PRC Regulations Relating to Securities and Futures Brokerage Business." However, we cannot assure you that we will not be subject to further investigation or scrutiny from regulators even though we had not yet received any negative opinion or penalty for the activities of our PRC entities or services provided to PRC investors so far. If we are required to make further rectifications, our business and financial condition could be materially and adversely affected. If we fail to receive required permits in a timely manner or at all, or obtain or renew any permits and certificates, we may be subject to fines, confiscation of the gains derived from our non-compliant activities, suspension of our non-compliant activities or claims for compensation of any economic loss suffered by our customers or other relevant parties.

23.    This risk disclosure was materially false and misleading and/or constituted a half-truth because, while the Company disclosed that it was not properly licensed in China, it materially misrepresented the level of risk of operating unlicensed in China. Rather than plainly

indicating that its activities in China were illegal, and that its Hong Kong license did not carry over to China, it falsely indicated that there were legal ambiguities to the applicable Chinese laws. Further, by stating that it was merely "possible" that the Chinese government may take the position that the Company required proper licensing and take regulatory action against it due to its lack of that license, the Company materially understated its regulatory risk.

24.    The 2019 Annual Report also contained the following section regarding Chinese securities laws:

**PRC Regulations Relating to Securities and Futures Brokerage Business**

Under existing PRC securities laws and regulations, including Securities Law of the PRC, which was most recently amended on 28 December, 2019 and the amended Securities Law of the PRC became effective on March 1, 2020, operating securities business in the PRC, including among others, securities brokerage business, futures brokerage business, stock option brokerage business, and securities and futures investment consulting services, requires a securities brokerage license or certain other approvals from the Chinese Securities Regulatory Commission, or the CSRC. In addition, the Securities Law also stipulates that the offering and trading of securities outside the People's Republic of China which disrupt the domestic market order of the People's Republic of China and harm the legitimate rights and interests of domestic investors shall be dealt with pursuant to the relevant provisions of this Securities Law, and legal liability shall be pursued. This is the second major set of amendments of the Securities Law since the major revision in 2005. Three main changes have been widely reported and discussed, namely, (i) the reform of the registration-based IPO system, (ii) the imposition of more severe punishments for violations, and (iii) the enhancement of protection for retail investors. Apart from these revisions, this article is intended to briefly introduce the following five aspects that are highlighted for foreign institutional investors, namely, (i) scope of application, (ii) program trading, (iii) prohibition on account lending and borrowing, (iv) short swing profit, and (v) changes in regard to 5% shareholding.

***Failure to comply with such laws and regulations may result in penalties, including rectification requirements, confiscation of illegal proceeds, fines or even shutting down of business.*** In relation to our business in the PRC, one of our PRC entities received a rectification notice issued by the Beijing branch of the CSRC in September 2016, which required us, among others, to refrain from providing support to unauthorized foreign service providers that conduct securities business in China. Following the notice, we took certain rectification measures, including among others, (i) removing links to, and access to account

opening functions of the website and the APP previously developed by such PRC entity; (ii) deleting "Zhengquan" (securities in Chinese) and "Gupiao" (stocks in Chinese) from the name of the APP previously developed by such PRC entity; and (iii) timely submitting in writing to the Beijing branch of the CSRC to brief on the rectification measures made by such PRC entity. Afterwards, we had communicated with the Beijing branch of the CSRC for a few times and further adjusted our business in China to comply with PRC laws. We believe that we have taken necessary measures in response to such notice and as of the date of this report, we had not received any further inquiry or rectification requirement from the CSRC. However, we cannot assure you that the CSRC will take the same view as us and do not expect a formal notice from the CSRC to inform us whether our PRC entity had satisfied the requirements in the aforementioned notice. See Item 3.D "Risk Factors—Risks Related to Our Business and Industry—We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents."

25.    This disclosure was materially false and misleading and/or constituted a half-truth because it discussed future penalties in general, hypothetical terms, rather than as being likely due to the Company's failure to obtain the required Chinese license.

26.    The 2019 Annual Report contained the following risk disclosure about the Company's regulatory risk:

> ***Non-compliance with applicable laws in certain jurisdictions could harm our business, reputation, financial condition and results of operations.***
>
> The businesses of securities and other financial instruments are heavily regulated. ***Our broker business is subject to regulations in the United States, Singapore, New Zealand, Australia and other jurisdictions in which we offer our products and services. Major regulatory bodies include, among others, in the United States, the Financial Industry Regulatory Authority, or the FINRA, and the SEC; in Singapore, the Monetary Authority of Singapore, or the MAS; in New Zealand, the Financial Markets Authority New Zealand, or the FMA, the New Zealand Stock Exchange, or the NZX, and the Financial Service Providers Register, or the FSPR; in Australia, the Australian Securities and Investments Commission, or the ASIC.*** Domestic and foreign stock exchanges, other self-regulatory organizations and state and foreign securities commissions can censure, fine, issue cease-and-desist orders, suspend or expel a broker and its officers or employees. Non-compliance with applicable laws or regulations could result in sanctions to be levied against us, including fines and censures, suspension or expulsion from a certain jurisdiction or market or the revocation or

limitation of licenses, which could adversely affect our reputation, prospects, revenues and earnings.

Furthermore, securities brokerage firms are subject to numerous conflicts of interest or perceived conflicts of interest, over which federal and state regulators and self-regulatory organizations have increased their scrutiny. Addressing conflicts of interest is a complex and difficult undertaking. Our business and reputation could be harmed if we were to fail, or appear to fail, to address conflicts appropriately.

* * *

***Our ability to comply with all applicable laws and rules is largely dependent on our internal system to ensure compliance, as well as our ability to attract and retain qualified compliance personnel.*** While we maintain systems and procedures designed to ensure that we comply with applicable laws and regulations, violations could still occur. Some legal and regulatory frameworks provide for the imposition of fines or penalties for non-compliance even though the non-compliance was inadvertent or unintentional and even though systems and procedures reasonably designed to prevent violations were in place at the time. There may be other negative consequences resulting from a finding of non-compliance, including restrictions on certain activities. Such a finding may also damage our reputation and our relationships with regulators and could restrict the ability of institutional investment managers to invest in our securities.

27.    This statement was materially false and misleading and/or constituted a half-truth because it did not state that the China Securities Regulatory Commission ("CSRC") was a major regulatory body that could bring enforcement action against the Company due to its unlicensed activities in China.  In addition, the Company did not state that its internal compliance system may prove ineffective due to its lack of licensing in China.

28.    On April 28, 2021, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2020 (the "2020 Annual Report").  Attached to the 2020 Annual Report were signed certifications pursuant SOX signed by Defendants Wu and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

29.     The 2020 Annual Report contained the following disclosure about the Company's unlicensed activities in China:

> ***We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents***.
>
> We operate in a heavily-regulated industry which requires various licenses, permits and approvals in different jurisdictions to conduct our businesses. ***Our customers include people who live in jurisdictions where we do not have licenses issued by the local regulatory bodies. It is possible that authorities in those jurisdictions may take the position that we are required to obtain licenses or otherwise comply with laws and regulations which we believe are not required or applicable to our business activities.*** If we fail to comply with the regulatory requirements, we may encounter the risk of being disqualified for our existing businesses or being rejected for renewal of our qualifications upon expiry by the regulatory authorities as well as other penalties, fines or sanctions. In addition, in respect of any new business that we may contemplate, we may not be able to obtain the relevant approvals for developing such new business if we fail to comply with the relevant regulations and regulatory requirements. As a result, we may fail to develop new business as planned, or we may fall behind our competitors in such businesses.
>
> In addition, a significant portion of our technology research and development, management, supporting and other teams are based in China and a significant portion of our customers are Chinese speaking people including PRC citizens. Our PRC subsidiaries and VIEs work closely with and provide significant supporting services for our trading platform outside of China as well as teams in New Zealand, Hong Kong, Singapore, the United States and Australia. In the opinion of our PRC legal counsel, our current supporting activities in China do not require a securities brokerage license or permit under the existing PRC securities laws and regulations. ***However, new laws and regulations in connection with our business activities may be adopted from time to time. There may be substantial uncertainties regarding the interpretation and application of current or any future PRC laws and regulations applicable to our business and that the PRC government or other governmental authorities may ultimately take a view that is inconsistent with the opinion of our PRC legal counsel. For instance, if certain of our activities in China were deemed by relevant regulators as provision of securities brokerage services, future brokerage services, securities or futures investment consulting services or stock option brokerage business, we might be subject to licensing requirements from the China Securities Regulatory Commission ("CSRC").***

> In July 2016, the CSRC posted an investor alert on its website warning investors that except for certain investment channels approved by the CSRC under the PRC laws, the CSRC has not approved any domestic or foreign institutions to provide services for domestic investors to participate in overseas securities trading. In September 2016, we received a rectification notice issued by the Beijing branch of the CSRC. Following such notice, we took certain rectification measures in order to comply with the requirements set forth therein, and we provided written responses to such authority promptly. We communicate with the Beijing branch of the CSRC from time to time to ensure our business follow their requirements. As of the date of this report, we have not received further written rectification requirements from the CSRC. For more details of the notice and our rectification measures, please see Item 4.B "Business Overview —PRC Regulations Relating to Securities and Futures Brokerage Business." However, we cannot assure you that we will not be subject to further investigation or scrutiny from regulators even though we had not yet received any negative opinion or penalty for the activities of our PRC entities or services provided to PRC investors so far. If we are required to make further rectifications, our business and financial condition could be materially and adversely affected. If we fail to receive required permits in a timely manner or at all, or obtain or renew any permits and certificates, we may be subject to fines, confiscation of the gains derived from our non-compliant activities, suspension of our non-compliant activities or claims for compensation of any economic loss suffered by our customers or other relevant parties.

30.     This risk disclosure was materially false and misleading and/or constituted a half-truth because, while the Company disclosed that it was not properly licensed in China, it materially misrepresented the level of risk of operating unlicensed in China.  Rather than plainly indicating that its activities in China were illegal, and that its Hong Kong license did not carry over to China, it falsely indicated that there were legal ambiguities to the applicable Chinese laws.  Further, by stating that it was merely "possible" that the Chinese government may take the position that the Company required proper licensing and take regulatory action against it due to its lack of that license, the Company materially understated its regulatory risk.

31.     The 2020 Annual Report also contained the following section regarding Chinese securities laws:

**PRC Regulations Relating to Securities and Futures Brokerage Business**

Under existing PRC securities laws and regulations, including Securities Law of the PRC, which was most recently amended on 28 December, 2019 and the amended Securities Law of the PRC became effective on March 1, 2020, operating securities business in the PRC, *including among others, securities brokerage business, futures brokerage business, stock option brokerage business, and securities and futures investment consulting services, requires a securities brokerage license or certain other approvals from the Chinese Securities Regulatory Commission, or the CSRC. In addition, the Securities Law also stipulates that the offering and trading of securities outside the People's Republic of China which disrupt the domestic market order of the People's Republic of China and harm the legitimate rights and interests of domestic investors shall be dealt with pursuant to the relevant provisions of this Securities Law, and legal liability shall be pursued*. This is the second major set of amendments of the Securities Law since the major revision in 2005. Three main changes have been widely reported and discussed, namely, (i) the reform of the registration-based IPO system, (ii) the imposition of more severe punishments for violations, and (iii) the enhancement of protection for retail investors. Apart from these revisions, this article is intended to briefly introduce the following five aspects that are highlighted for foreign institutional investors, namely, (i) scope of application, (ii) program trading, (iii) prohibition on account lending and borrowing, (iv) short swing profit, and (v) changes in regard to 5% shareholding.

*Failure to comply with such laws and regulations may result in penalties, including rectification requirements, confiscation of illegal proceeds, fines or even shutting down of business*. In relation to our business in the PRC, one of our PRC entities received a rectification notice issued by the Beijing branch of the CSRC in September 2016, which required us, among others, to refrain from providing support to unauthorized foreign service providers that conduct securities business in China. Following the notice, we took certain rectification measures, including among others, (i) removing links to, and access to account opening functions of the website and the APP previously developed by such PRC entity; (ii) deleting "Zhengquan" (securities in Chinese) and "Gupiao" (stocks in Chinese) from the name of the APP previously developed by such PRC entity; and (iii) timely submitting in writing to the Beijing branch of the CSRC to brief on the rectification measures made by such PRC entity. Afterwards, we had communicated with the Beijing branch of the CSRC for a few times and further adjusted our business in China to comply with PRC laws. We believe that we have taken necessary measures in response to such notice and as of the date of this report, we had not received any further inquiry or rectification requirement from the CSRC. However, we cannot assure you that the CSRC will take the same view as us and do not expect a formal notice from the CSRC to inform us whether our PRC entity had satisfied the requirements in the aforementioned notice. See Item 3.D "Risk Factors—Risks Related to Our Business and Industry—We may not be able to obtain or maintain all necessary licenses, permits and approvals and to

make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents."

32.     This disclosure was materially false and misleading and/or constituted a half-truth because it discussed future penalties in general, hypothetical terms, rather than as being likely due to the Company's failure to obtain the required Chinese license.

33.     The 2020 Annual Report contained the following risk disclosure about the Company's regulatory risk:

> ***Non-compliance with applicable laws in certain jurisdictions could harm our business, reputation, financial condition and results of operations.***
>
> The businesses of securities and other financial instruments are heavily regulated. ***Our brokerage business is subject to regulations in the United States, Singapore, New Zealand, Australia and other jurisdictions in which we offer our products and services. Major regulatory bodies include, among others, in the United States, the Financial Industry Regulatory Authority, or the FINRA, the U.S. Securities and Exchange Commission, or the SEC, and the Commodity Futures Trading Commission, or the CFTC; in Singapore, the Monetary Authority of Singapore, or the MAS; in New Zealand, the Financial Markets Authority New Zealand, or the FMA, the New Zealand Stock Exchange, or the NZX, and the Financial Service Providers Register, or the FSPR; in Australia, the Australian Securities and Investments Commission, or ASIC***. Domestic and foreign stock exchanges, other self-regulatory organizations and state and foreign securities commissions can censure, fine, issue cease-and-desist orders, suspend or expel a broker and its officers or employees. ***Non-compliance with applicable laws or regulations could result in sanctions to be levied against us, including fines and censures, suspension or expulsion from a certain jurisdiction or market or the revocation or limitation of licenses, which could adversely affect our reputation, prospects, revenues and earnings***.
>
> Furthermore, securities brokerage firms are subject to numerous conflicts of interest or perceived conflicts of interest, over which federal and state regulators and self-regulatory organizations have increased their scrutiny. Addressing conflicts of interest is a complex and difficult undertaking. Our business and reputation could be harmed if we were to fail, or appear to fail, to address conflicts appropriately.

* * *

Our ability to comply with all applicable laws and rules is largely dependent on our internal and third party vendors' system to ensure compliance, as well as our ability to attract and retain qualified compliance personnel. While we maintain systems and procedures designed to ensure that we comply with applicable laws and regulations, violations could still occur. Some legal and regulatory frameworks provide for the imposition of fines or penalties for non-compliance even though the non-compliance was inadvertent or unintentional and even though systems and procedures reasonably designed to prevent violations were in place at the time. There may be other negative consequences resulting from a finding of non-compliance, including restrictions on certain activities. Such a finding may also damage our reputation and our relationships with regulators and could restrict the ability of institutional investment managers to invest in our securities.

34.     This statement was materially false and misleading and/or constituted a half-truth because it did not state that the CSRC was a major regulatory body that could bring enforcement action against the Company due to its unlicensed activities in China.  Further, it discussed potential penalties due to legal non-compliance in hypothetical terms even though it was, in fact, likely that the Company would face penalties due to its ongoing non-compliance with Chinese law.

35.     On April 28, 2022, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2021 (the "2021 Annual Report").  Attached to the 2021 Annual Report were signed certifications pursuant to SOX signed by Defendants Wu and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

36.     The 2021 Annual Report contained the following disclosure about the Company's unlicensed activities in China:

*We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents.*

We operate in a heavily-regulated industry which requires various licenses, permits and approvals in different jurisdictions to conduct our businesses. Our customers include people who live in jurisdictions where we do not have licenses issued by the local regulatory bodies. ***It is possible that authorities in those jurisdictions may take the position that we are required to obtain licenses or otherwise comply with laws and regulations which we believe are not required or applicable to our business activities. If we fail to comply with the regulatory requirements, we may encounter the risk of being disqualified for our existing businesses or being rejected for renewal of our qualifications upon expiry by the regulatory authorities as well as other penalties, fines or sanctions.*** In addition, in respect of any new business that we may contemplate, we may not be able to obtain the relevant approvals for developing such new business if we fail to comply with the relevant regulations and regulatory requirements. As a result, we may fail to develop new business as planned, or we may fall behind our competitors in such businesses.

In addition, a significant portion of our technology research and development, management, supporting and other teams are based in China and a significant portion of our customers are Chinese speaking people including PRC citizens. Our PRC subsidiaries and VIEs work closely with and provide significant supporting services for our trading platform outside of China as well as teams in New Zealand, Hong Kong, Singapore, the United States and Australia. In the opinion of our PRC legal counsel, our current supporting activities in China do not require a securities brokerage license or permit under the existing PRC securities laws and regulations. However, new laws and regulations in connection with our business activities may be adopted from time to time. There may be substantial uncertainties regarding the interpretation and application of current or any future PRC laws and regulations applicable to our business and that the PRC government or other governmental authorities may ultimately take a view that is inconsistent with the opinion of our PRC legal counsel. For instance, if certain of our activities in China were deemed by relevant regulators as provision of securities brokerage services, future brokerage services, securities or futures investment consulting services or stock option brokerage business, we might be subject to licensing requirements from the China Securities Regulatory Commission ("CSRC").

In July 2016, the CSRC posted an investor alert on its website warning investors that except for certain investment channels approved by the CSRC under the PRC laws, the CSRC has not approved any domestic or foreign institutions to provide services for domestic investors to participate in overseas securities trading. In September 2016, we received a rectification notice issued by the Beijing branch of the CSRC. Following such notice, we took certain rectification measures in order to comply with the requirements set forth therein, and we provided written responses to such authority promptly. We communicate with the Beijing branch of the CSRC from time to time to ensure our business follow their requirements. As of the date of this report, we have not received further written rectification

requirements from the CSRC. For more details of the notice and our rectification measures, please see "Item 3. Key Information – Description of Certain PRC Regulations Affecting Our Business." However, we cannot assure you that we will not be subject to further investigation or scrutiny from regulators even though we had not yet received any negative opinion or penalty for the activities of our PRC entities or services provided to PRC investors so far. If we are required to make further rectifications, our business and financial condition could be materially and adversely affected. If we fail to receive required permits in a timely manner or at all, or obtain or renew any permits and certificates, we may be subject to fines, confiscation of the gains derived from our non-compliant activities, suspension of our non-compliant activities or claims for compensation of any economic loss suffered by our customers or other relevant parties.

37.     This risk disclosure was materially false and misleading and/or constituted a half-truth because, while the Company disclosed that it was not properly licensed in China, it materially misrepresented the level of risk of operating unlicensed in China.  Rather than plainly indicating that its activities in China were illegal, and that its Hong Kong license did not carry over to China, it falsely indicated there were legal ambiguities to the applicable Chinese laws. Further, by stating that it was merely "possible" that the Chinese government may take the position that the Company required proper licensing and take regulatory action against it due to its lack of that license, the Company materially understated its regulatory risk.

38.     In addition, as discussed below, by the time the 2021 Annual Report was filed with the SEC, in April 2022, the head of the financial stability department of the People's Bank of China, China's central bank, had stated publicly that offering securities-brokerage services to mainland Chinese investors without obtaining the required licenses was "illegal financial activity."

39.     The 2021 Annual Report contained, in pertinent part, the following disclosure about the likelihood of Chinese government intervention:

*The PRC government may intervene or influence our operations at any time, and it has recently indicated an intent to exert more oversight and control over*

*overseas securities offerings and other capital markets activities and foreign investment in China-based companies.*

*As a result of its significant oversight authority into businesses operating in the PRC, the PRC government may intervene or influence our operations at any time*. Uncertainties regarding the enforcement of laws and the fact that rules and regulations in the PRC can change quickly with little advance notice, along with the risk that the PRC government may intervene or influence our operations at any time, could have a material adverse effect on our business, financial position, results of operations, access to the capital markets, and the market value of our ADSs.

Furthermore, on July 6, 2021, the General Office of the Communist Party of China Central Committee and the General Office of the State Council issued *Several Opinions Concerning Lawfully and Strictly Cracking Down Illegal Securities Activities. These opinions call for strengthened regulation over illegal securities activities and supervision on overseas listings by China-based companies like us*, and propose to take effective measures, such as promoting the construction of relevant regulatory systems to deal with the risks and incidents faced by China-based overseas-listed companies. As a follow-up, on December 24, 2021, the State Council issued a draft of the Provisions of the State Council on the Administration of Overseas Securities Offering and Listing by Domestic Companies, or the Draft Provisions, and the CSRC issued a draft of Administration Measures for the Filing of Overseas Securities Offering and Listing by Domestic Companies, or the Draft Administration Measures, for public comments. As of the date of this annual report, the period for public comment on these draft regulations has ended while no official rules are issued. There are uncertainties as to whether the Draft Provisions and the Draft Administration Measures would be further amended, revised or updated. Substantial uncertainties exist with respect to the enactment timetable and final content of the Draft Provisions and the Draft Administration Measures. Additional oversight or regulation of this nature could have a material adverse effect on our ability to offer or continue to offer securities to investors and could have a material adverse effect on the market price of our ADSs. For more details, please refer to "Description of Certain PRC Regulations Affecting Our Business - Regulations Relating to Overseas Offerings."

40.    This statement was materially false and misleading and/or constituted a half-truth

because it did not state that it was at an increased risk of regulatory enforcement as a proximate

result of its failure to obtain the proper Chinese licensing.  It also did not disclose that, by the

time the 2021 Annual Report was filed, the head of the financial stability department of the

People's Bank of China had referred to UP Fintech's unlicensed activities as "illegal financial behavior."

41.    The 2021 Annual Report contained the following section regarding Chinese securities laws:

**PRC Regulations Relating to Securities and Futures Brokerage Business**

Under existing PRC securities laws and regulations, including Securities Law of the PRC, which was most recently amended on 28 December, 2019 and the amended Securities Law of the PRC became effective on March 1, 2020, operating securities business in the PRC, including among others, securities brokerage business, futures brokerage business, stock option brokerage business, and securities and futures investment consulting services, requires a securities brokerage license or certain other approvals from the Chinese Securities Regulatory Commission, or the CSRC. *In addition, the Securities Law also stipulates that the offering and trading of securities outside the People's Republic of China which disrupt the domestic market order of the People's Republic of China and harm the legitimate rights and interests of domestic investors shall be dealt with pursuant to the relevant provisions of this Securities Law, and legal liability shall be pursued*. This is the second major set of amendments of the Securities Law since the major revision in 2005. Three main changes have been widely reported and discussed, namely, (i) the reform of the registration-based IPO system, (ii) the imposition of more severe punishments for violations, and (iii) the enhancement of protection for retail investors.

Failure to comply with such laws and regulations may result in penalties, including rectification requirements, confiscation of illegal proceeds, fines or even shutting down of business. In relation to our business in the PRC, one of our PRC entities received a rectification notice issued by the Beijing branch of the CSRC in September 2016, which required us, among others, to refrain from providing support to unauthorized foreign service providers that conduct securities business in China. Following the notice, we took certain rectification measures, including among others, (i) removing links to, and access to account opening functions of the website and the APP previously developed by such PRC entity; (ii) deleting "Zhengquan" (securities in Chinese) and "Gupiao" (stocks in Chinese) from the name of the APP previously developed by such PRC entity; and (iii) timely submitting in writing to the Beijing branch of the CSRC to brief on the rectification measures made by such PRC entity. Afterwards, we had communicated with the Beijing branch of the CSRC for a few times and further adjusted our business in China to comply with PRC laws. We believe that we have taken necessary measures in response to such notice and as of the date of this report, we had not received any further inquiry or rectification requirement from the CSRC. However, we cannot assure you that the CSRC will take the same view

as us and do not expect a formal notice from the CSRC to inform us whether our PRC entity had satisfied the requirements in the aforementioned notice. See Item 3.D "Risk Factors-Risks Related to Our Business and Industry-We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents."

42.      This disclosure was materially false and misleading and/or constituted a half-truth because it discussed future penalties in general, hypothetical terms, rather than as likely due to the Company's failure to obtain the required Chinese license, and the head of the financial stability department of the People's Bank of China's characterization of operating without a license as "illegal financial behavior."

43.      The 2021 Annual Report contained the following risk disclosure about the Company's regulatory risk:

> ***Non-compliance with applicable laws in certain jurisdictions could harm our business, reputation, financial condition and results of operations.***
>
> The businesses of securities and other financial instruments are heavily regulated. Our brokerage business is subject to regulations in the United States, Singapore, New Zealand, Australia, Hong Kong and other jurisdictions in which we offer our products and services. ***Major regulatory bodies include, among others, in the United States, the Financial Industry Regulatory Authority, or the FINRA, the U.S. Securities and Exchange Commission, or the SEC, and the Commodity Futures Trading Commission, or the CFTC; in Singapore, the Monetary Authority of Singapore, or the MAS; in New Zealand, the Financial Markets Authority New Zealand, or the FMA, and the Financial Service Providers Register, or the FSPR; in Australia, the Australian Securities and Investments Commission, or ASIC; in Hong Kong, the Securities and Futures Commission or SFC.*** Domestic and foreign stock exchanges, other self-regulatory organizations and state and foreign securities commissions can censure, fine, issue cease-and-desist orders, suspend or expel a broker and its officers or employees. Non-compliance with applicable laws or regulations could result in sanctions to be levied against us, including fines and censures, suspension or expulsion from a certain jurisdiction or market or the revocation or limitation of licenses, which could adversely affect our reputation, prospects, revenues and earnings.
>
> Furthermore, securities brokerage firms are subject to numerous conflicts of interest or perceived conflicts of interest, over which federal and state regulators

and self-regulatory organizations have increased their scrutiny. Addressing conflicts of interest is a complex and difficult undertaking. Our business and reputation could be harmed if we were to fail, or appear to fail, to address conflicts appropriately.

\* \* \*

Our ability to comply with all applicable laws and rules is largely dependent on our internal and third party vendors' system to ensure compliance, as well as our ability to attract and retain qualified compliance personnel. ***While we maintain systems and procedures designed to ensure that we comply with applicable laws and regulations, violations could still occur***. Some legal and regulatory frameworks provide for the imposition of fines or penalties for non-compliance even though the non-compliance was inadvertent or unintentional and even though systems and procedures reasonably designed to prevent violations were in place at the time. There may be other negative consequences resulting from a finding of non-compliance, including restrictions on certain activities. Such a finding may also damage our reputation and our relationships with regulators and could restrict the ability of institutional investment managers to invest in our securities.

44.     This statement was materially false and misleading and/or constituted a half-truth because it did not state that the CSRC was a major regulatory body that could bring enforcement action against the Company because of its unlicensed activities in China.  In addition, penalties were discussed in hypothetical terms. In reality, by the time the 2021 Annual Report was filed, UP Fintech's unlicensed activities in China had been characterized as "illegal financial activity" by a high-level government figure.

45.     On April 26, 2023, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2022 (the "2022 Annual Report").  Attached to the 2022 Annual Report were signed certifications pursuant to SOX signed by Defendants Wu and Zeng attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

46.     The 2022 Annual Report contained the following risk disclosure regarding the Company's unlicensed operations in China:

***We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents.***

We operate in a heavily-regulated industry which requires various licenses, permits and approvals in different jurisdictions to conduct our businesses. Our customers include people who live in jurisdictions where we do not have licenses issued by the local regulatory bodies. ***It is possible that authorities in those jurisdictions may take the position that we are required to obtain licenses or otherwise comply with laws and regulations which we believe are not required or applicable to our business activities. If we fail to comply with the regulatory requirements, we may encounter the risk of being disqualified for our existing businesses or being rejected for renewal of our qualifications upon expiry by the regulatory authorities as well as other penalties, fines or sanctions***. In addition, in respect of any new business that we may contemplate, we may not be able to obtain the relevant approvals for developing such new business if we fail to comply with the relevant regulations and regulatory requirements. As a result, we may fail to develop new business as planned, or we may fall behind our competitors in such businesses.

In addition, a significant portion of our technology research and development, management, supporting and other teams are based in China and a significant portion of our customers are Chinese speaking people including PRC citizens. Our PRC subsidiaries and the VIEs work closely with and provide significant supporting services for our trading platform outside of China as well as teams in New Zealand, Hong Kong, Singapore, the United States and Australia.

In July 2016, the CSRC posted an investor alert on its website warning investors that except for certain investment channels approved by the CSRC under the PRC laws, the CSRC has not approved any domestic or foreign institutions to provide services for domestic investors to participate in overseas securities trading. In September 2016, we received a rectification notice issued by the Beijing branch of the CSRC. Following such notice, we took certain rectification measures in order to comply with the requirements set forth therein, and we provided written responses to such authority promptly. We communicate with the Beijing branch of the CSRC from time to time to ensure our business follow their requirements.

On December 30, 2022, the CSRC issued the CSRC 1230 Notice, ***stating that we had been carried out cross-border securities business for Chinese mainland investors without approval of the CSRC, and such activities constitute illegal operation of securities business under the Securities Law of the PRC***. The CSRC 1230 Notice set out two principal rectification requirements. (i) We should stop all incremental illegal operations in Chinese mainland, such as soliciting and developing any new Chinese mainland customers or opening new securities accounts for them. (ii) We should properly handle the existing accounts held by

22

Chinese mainland investors by allowing them to continue their transactions through such accounts. However, we are strictly prohibited from accepting any incremental funds that violate PRC foreign exchange regulations to such existing accounts. Furthermore, on February 15, 2023, the CSRC published its official reply in response to the public attention on the CSRC 1230 Notice, emphasizing its core requirements of "prohibiting incremental illegal business effectively and solving existing issues properly" in order to regulate our business operations in Chinese mainland. We have been actively and may continue to be in cooperation with CSRC to satisfy 1230 Notice and meet the rectification requirements set out under CSRC 1230 Notice. ***Besides, we cannot rule out the possibility that we may take the initiative to adopt applicable rectification measures in the future to further curb incremental Chinese mainland domestic users and meet the requirements of the CSRC***.

***However, if the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected***. Furthermore, new laws and regulations in connection with our business activities may be adopted from time to time. While we will make best efforts to continue to fulfill the requirements under any applicable future PRC laws and regulations, there may be substantial uncertainties regarding the interpretation and application of current or any future PRC laws and regulations applicable to our business and the PRC government or other governmental authorities may ultimately take a view that is inconsistent with our opinion.

47.    This risk disclosure was materially false and misleading and/or constituted a half-truth because, while the Company disclosed that it was not properly licensed in China and that certain enforcement actions had occurred over 2022 and 2023, it materially misrepresented the ongoing level of risk of operating unlicensed in China.  Rather than plainly indicating that its activities in China were illegal, and that its Hong Kong license did not carry over to China, it falsely indicated that there were legal ambiguities to the applicable Chinese laws.  Further, by stating that it was merely "possible" that the Chinese government may take the position that the Company required proper licensing, and take regulatory action against it due to its lack of that license, the Company materially understated its regulatory risk.

48.    The 2022 Annual Report contained the following section regarding Chinese securities laws:

***PRC Regulations Relating to Securities and Futures Brokerage Business***

Under existing PRC securities laws and regulations, including Securities Law of the PRC, which was most recently amended on 28 December, 2019 and the amended Securities Law of the PRC became effective on March 1, 2020, operating securities business in the PRC, ***including among others, securities brokerage business, futures brokerage business, stock option brokerage business, and securities and futures investment consulting services, requires a securities brokerage license or certain other approvals from the Chinese Securities Regulatory Commission, or the CSRC. In addition, the Securities Law also stipulates that the offering and trading of securities outside the People's Republic of China which disrupt the domestic market order of the People's Republic of China and harm the legitimate rights and interests of domestic investors shall be dealt with pursuant to the relevant provisions of this Securities Law, and legal liability shall be pursued***. This is the second major set of amendments of the Securities Law since the major revision in 2005. Three main changes have been widely reported and discussed, namely, (i) the reform of the registration-based IPO system, (ii) the imposition of more severe punishments for violations, and (iii) the enhancement of protection for retail investors.

On January 13, 2023, the CSRC promulgated the Measures for the Administration of the Securities Brokerage Business, which became effective on February 28, 2023. Under the Measures for the Administration of the Securities Brokerage Business, an overseas securities business entity that conducts securities business or establishes a representative office in Chinese mainland shall obtain the approval of the securities regulatory authority of the State Council. The specific measures shall be formulated by the securities regulatory agency of the State Council and submitted to the State Council for approval. An overseas securities business entity violating Article 95 of the Regulations on Supervision and Administration of Securities Firms, directly or through its affiliates conducting activities such as opening account, marketing and other activities of overseas securities trading services for domestic investors without authorization, shall be penalized in accordance with the Securities Law of the PRC.

***Failure to comply with such laws and regulations may result in penalties, including rectification requirements, confiscation of illegal proceeds, fines or even shutting down of business***. In relation to our business in the PRC, one of our PRC entities received a rectification notice issued by the Beijing branch of the CSRC in September 2016, which required us, among others, to refrain from providing support to unauthorized foreign service providers that conduct securities business in China. Following the notice, we took certain rectification measures, including among others, (i) removing links to, and access to account opening functions of the website and the APP previously developed by such PRC entity; (ii) deleting "Zhengquan" (securities in Chinese) and "Gupiao" (stocks in Chinese) from the name of the APP previously developed by such PRC entity; and (iii) timely submitting in writing to the Beijing branch of the CSRC to brief on the

rectification measures made by such PRC entity. Afterwards, we had communicated with the Beijing branch of the CSRC for a few times and further adjusted our business in China to comply with PRC laws. We believe that we have taken necessary measures in response to the above notice.

However, on December 30, 2022, the CSRC issued another notice, or CSRC 1230 Notice, stating that we had carried out cross-border securities business for Chinese mainland investors without approval from the CSRC, and such activities constitute illegal operation of securities business under the Securities Law of the PRC. The CSRC 1230 Notice set out two principal rectification requirements: (i) we should stop all incremental illegal operations in Chinese mainland, such as soliciting and developing any new Chinese mainland customers or opening new securities accounts for them; and (ii) we should properly handle the existing accounts held by Chinese mainland investors by allowing them to continue their transactions through such accounts. However, we are strictly prohibited from accepting any incremental funds that violate PRC foreign exchange regulations to such existing accounts. Furthermore, on February 15, 2023, the CSRC published its official reply in response to the public attention on the CSRC 1230 Notice, emphasizing its core requirements of "prohibiting incremental illegal business effectively and solving existing issues properly" in relation to its supervision and regulation of our business operations in Chinese mainland. We have been actively and will use best efforts to continue to be in cooperation with CSRC to satisfy 1230 Notice and meet the rectification requirements set out under CSRC 1230 Notice.

***However, we cannot assure you that we will not be subject to further investigation or scrutiny or be imposed any additional requirements in the future***. Besides, if the CSRC is not satisfied with our rectification measures or the CSRC imposes other further regulatory actions or penalties on us, our business and results of operations may be materially and adversely affected. See Item 3.D "Risk Factors-Risks Related to Our Business and Industry-We may not be able to obtain or maintain all necessary licenses, permits and approvals and to make all necessary registrations and filings for our activities in multiple jurisdictions and related to residents therein, especially in China or otherwise related to PRC residents."

49.    This statement was materially false and misleading and/or constituted a half-truth because it understated the likelihood of substantial penalties up to and including ceasing most business activities in China as a result of its multi-year failure to obtain the applicable permits, and because of a high level government figure's 2021 characterization of the Company's unlicensed Chinese business activities as "illegal financial activity."

50.     The 2022 Annual Report contained, in pertinent part, the following disclosure about the likelihood of Chinese government intervention:

> ***The PRC government may intervene or influence our operations at any time, and it has recently indicated an intent to exert more oversight and control over overseas securities offerings and other capital markets activities and foreign investment in China-based companies.***
>
> As a result of its significant oversight authority into businesses operating in the PRC, ***the PRC government may intervene or influence our operations at any time. Uncertainties regarding the enforcement of laws and the fact that rules and regulations in the PRC can change quickly with little advance notice, along with the risk that the PRC government may intervene or influence our operations at any time, could have a material adverse effect on our business, financial position, results of operations, access to the capital markets, and the market value of our ADSs.***
>
> Furthermore, on July 6, 2021, the General Office of the Communist Party of China Central Committee and the General Office of the State Council issued Several Opinions Concerning Lawfully and Strictly Cracking Down Illegal Securities Activities. ***These opinions call for strengthened regulation over illegal securities activities and supervision on overseas listings by China-based companies like us, and propose to take effective measures, such as promoting the construction of relevant regulatory systems to deal with the risks and incidents faced by China-based overseas-listed companies.*** On February 17, 2023, the CSRC promulgated Trial Administrative Measures of the Overseas Securities Offering and Listing by Domestic Companies, or the Overseas Listing Trial Measures and relevant five guidelines, which became effective on March 31, 2023.
>
> The Overseas Listing Trial Measures comprehensively improve and reform the existing regulatory regime for overseas offering and listing of Chinese mainland domestic companies' securities and regulates both direct and indirect overseas offering and listing of Chinese mainland domestic companies' securities by adopting a filing-based regulatory regime.
>
> On the same day, the CSRC also held a press conference for the release of the Overseas Listing Trial Measures and issued the Notice on Administration for the Filing of Overseas Offering and Listing by Domestic Companies, which, among others, clarifies that (i) prior to the effective date of the Overseas Listing Trial Measures, Chinese mainland domestic companies that have already completed overseas listing shall be regarded as "existing companies", which are not required to fulfill filing procedure immediately but shall be required to complete the filing if such existing companies conduct refinancing in the future; and (ii) the CSRC will solicit opinions from relevant regulatory authorities and complete the filing

of the overseas listing of companies with contractual arrangements which duly meet the compliance requirements, and support the development and growth of these companies by enabling them to utilize two markets and two kinds of resources.

However, since the Overseas Listing Trial Measures was newly promulgated, the interpretation, application and enforcement of Overseas Listing Trial Measures remain unclear. Besides, there are still uncertainties as to whether the Overseas Listing Trial Measures and relevant five guidelines would be further amended, revised or updated. Given the substantial uncertainties surrounding the latest CSRC filing requirements at this stage, we cannot assure you that we will be able to complete the filings and fully comply with the relevant new rules on a timely basis, if at all. Additional oversight or regulation of this nature could have a material adverse effect on our ability to offer or continue to offer securities to investors and could have a material adverse effect on the market price of our ADSs. For more details, please refer to "Description of Certain PRC Regulations Affecting Our Business - Regulations Relating to Overseas Offerings".

51.    This statement was materially false and misleading and/or constituted a half-truth because it did not state that the Company was experiencing an increased risk of regulatory enforcement as a proximate result of its failure to obtain the proper Chinese licensing.  It also did not disclose that, the prior year, the head of the financial stability department of the People's Bank of China had referred to UP Fintech's unlicensed activities as "illegal financial behavior," significantly raising the likelihood of regulatory enforcement.

52.    The 2022 Annual Report contained the following risk disclosure about the Company's regulatory risk:

*Non-compliance with applicable laws in the jurisdictions in which we operate could harm our business, reputation, financial condition and results of operations.*

The businesses of securities and other financial instruments are heavily regulated. *Our brokerage business is subject to regulations in the United States, Singapore, New Zealand, Australia, Hong Kong and other jurisdictions in which we offer our products and services. Major regulatory bodies include, among others, in the United States, the Financial Industry Regulatory Authority, or the FINRA, the U.S. Securities and Exchange Commission, or the SEC, and the Commodity Futures Trading Commission, or the CFTC; in Singapore, the Monetary Authority of Singapore, or the MAS; in New Zealand,*

*the Financial Markets Authority New Zealand, or the FMA, and the Financial Service Providers Register, or the FSPR; in Australia, the Australian Securities and Investments Commission, or ASIC; in Hong Kong, the Securities and Futures Commission or SFC*. Domestic and foreign stock exchanges, other self-regulatory organizations and state and foreign securities commissions can censure, fine, issue cease-and-desist orders, suspend or expel a broker and its officers or employees. *Non-compliance with applicable laws or regulations could result in sanctions to be levied against us, including fines and censures, suspension or expulsion from a certain jurisdiction or market or the revocation or limitation of licenses, which could adversely affect our reputation, prospects, revenues and earnings*.

*Furthermore, securities brokerage firms are subject to numerous conflicts of interest or perceived conflicts of interest, over which federal and state regulators and self-regulatory organizations have increased their scrutiny*. Addressing conflicts of interest is a complex and difficult undertaking. Our business and reputation could be harmed if we were to fail, or appear to fail, to address conflicts appropriately.

\* \* \*

Our ability to comply with all applicable laws and rules is largely dependent on our internal and third party vendors' system to ensure compliance, as well as our ability to attract and retain qualified compliance personnel. While we maintain systems and procedures designed to ensure that we comply with applicable laws and regulations, violations could still occur. Some legal and regulatory frameworks provide for the imposition of fines or penalties for non-compliance even though the non-compliance was inadvertent or unintentional and even though systems and procedures reasonably designed to prevent violations were in place at the time. There may be other negative consequences resulting from a finding of non-compliance, including restrictions on certain activities. Such a finding may also damage our reputation and our relationships with regulators and could restrict the ability of institutional investment managers to invest in our securities.

53.     This statement was materially false and misleading and/or constituted a half-truth because it did not state that the CSRC was a major regulatory body that could bring enforcement action against the Company because of its unlicensed activities in China.  In addition, penalties were discussed in hypothetical terms even though UP Fintech's unlicensed activities in China had been characterized as "illegal financial activity" by a high level government figure.

54.     The statements contained in ¶¶21-22, 24, 26, 28-29, 31, 33, 35-36, 39, 41, 43, 45-46, 48, 50, and 52 were materially false and/or misleading and/or constituted half-truths because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or half-truths that: (1) UP Fintech was engaged in illegal conduct as it related to operations in China as a result of its failure to obtain the proper licenses; (2) it did not fully disclose to investors that it was engaging in unlawful activity and instead characterized the applicable Chinese laws as ambiguous; (3) the foregoing subjected the Company to a heightened risk of regulatory enforcement; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis.

55.     Additionally, the statements contained in ¶¶21-22, 24, 26, 28-29, 31, 33, 35-36, 39, 41, 43, 45-46, 48, 50, and 52 were also materially false and/or misleading and/or constituted half-truths because of the account of a former Company employee.  CW1 served as the Head of Business Development at the Company from September 2017 to July 2020.  CW1 began work at UP Fintech in 2016 as a temporary employee and, after several years of good performance, CW1 became a Company employee.

56.     CW1 stated that during his tenure at the Company, he witnessed the Company engage in numerous illegal business practices.  For instance, CW1 stated that in November 2020, Lei Fang ("Fang"), who was CW1's supervisor, requested CW1 to persuade approximately 100 customers to purchase UK stock on the premise that their stock price would definitely rise following the completion of a merger and acquisition that the Company was conducting.  CW1 stated that Fang promised the clients that UP Fintech would compensate each of the customers.

CW1 stated that at the time, Tiger Brokers/UP Fintech was attempting to assist Ucommune, which was under pressure to obtain sufficient funds and stock sales to complete the process of a merger and acquisition, and to comply to NASDAQ listing requirements.

57.    According to CW1, after these approximately 100 customers completed their purchases, the Company's stock price dropped dramatically, and the customers lost a significant amount of money.  CW1 stated, however, that Fang reneged on the promise and did not compensate them.  CW1 stated that the 100 customers were mostly from the United States, with money in the United States for purchasing NASDAQ listed shares.  CW1 believes that the Company's management had a close relationship with Ucommune, and that management was helping Ucommune at the time.

58.    On Thursday, October 28, 2021, *The Wall Street Journal* released an article entitled "Chinese Online Broker Shares Dropped After Criticism From Central Bank," which discussed a speech given by Sun Tianqi, the head of the financial stability department of the People's Bank of China, and which had been publicized that day.  The article stated, in pertinent part:

> ***A senior official at China's central bank said cross-border online brokerages operating in mainland China were acting illegally, knocking shares in [. . .] Up Fintech Holding Ltd.***
>
> ***The criticism heaps new pressure on the [firm] after [it was] called out earlier this month by Chinese state media, which said [it] would face challenges due to the country's tough new data-privacy laws.*** Chinese regulators have cracked down on various business sectors this year, including property development, after-school tutoring and parts of the technology industry.
>
> ***[. . .] Up Fintech, which is known in Asia as Tiger Brokers, ha[s] thrived partly by enabling customers in mainland China to buy and sell U.S. and Hong Kong-listed stocks.***
>
> Sun Tianqi, the head of the financial stability department of the People's Bank of China, ***told a forum in Shanghai that offering securities-brokerage services to***

*mainland Chinese investors without obtaining the required licenses was "illegal financial activity."*

*"Finance licenses have national boundaries," Mr. Sun said.*

*His speech was delivered on Sunday and was picked up by numerous media outlets on Thursday, after a transcript was released by organizers a day earlier.*

The central banker didn't name the two companies but identified them by referring to recent drops in their share prices.
Shares [of] Up Fintech fell sharply on Thursday. [. . .] Up Fintech tumbled 17% to $7.34. [. . .]

*China operates capital controls but Chinese nationals are able to open bank accounts in Hong Kong, and can move up to $50,000 a year offshore. [. . .]*

\* \* \*

"The top priority of our firm is compliance and adherence to laws and regulations," Up Fintech said in a statement. "We actively maintain communication with regulatory authorities to satisfy their requests and meet the obligations enumerated to our firm."

Separately, China's state-owned Securities Times reported on Oct. 15 that China's securities regulator is working on tighter regulation of onshore securities-brokerage businesses.

59.    On this news, the price of UP Fintech ADSs declined by $1.51 per ADS, or 17.06%, on extremely high trading volume, to close at $7.34 on October 28, 2021.  The next day it declined a further $0.87 per ADS, or 11.85%, to close at $6.47.

60.    On December 17, 2021, after market hours, *Reuters* released an article entitled "EXCLUSIVE Next in China Regulatory crackdown: online brokers- sources."  The article stated, in pertinent part:

*Chinese officials are planning to ban online brokerages such as [. . .] UP Fintech Holding Ltd from offering offshore trading services to mainland clients, the latest development in a broad regulatory crackdown that has roiled a wide range of sectors over the past year.*

The Nasdaq-listed Chinese [firm is one] of the biggest players in the sector and a ban would block millions of retail investors in mainland China from trading

securities easily in markets such as the United States and Hong Kong. ***Concerns over data security and capital outflows are driving the potential ban, sources said.***

The looming restrictions come on the heels of a clampdown that has affected a broad scope of companies over the past year, in sectors ranging from technology to education and real estate.

***Firms affected by the latest crackdown are likely to be notified of a ban in "the coming months", said one of four sources who spoke with Reuters.*** All sources declined to be identified as they were not authorised to speak to media.

***[. . .] UP Fintech [is] registered with the Securities and Futures Commission in Hong Kong but that permit does not extend to the mainland. No mainland licence exists for online brokerages specialising in cross-border trades, the sources said.***

\* \* \*

UP Fintech, which is valued at $737 million, ***said it had been following rules laid out by global regulators and would comply with and implement any new rules.***

[. . .] UP Fintech's [shares] were down around 2%. [The] [company's] shares had fallen in Friday's premarket trading, after the Reuters report.

The China Securities Regulatory Commission (CSRC), the State Administration of Foreign Exchange (SAFE) and the central bank did not immediately respond to a request for comment.

Chinese authorities raised concern about "cross-border" brokerages in October, exacerbating declines in [UP Fintech shares] which have plunged more than 80% since this year's peak in February.

\* \* \*

Apart from services offered by brokerages like [. . .] UP Fintech, mainland investors can only invest in securities outside China through so-called qualified domestic institutional investor (QDII) schemes as well as connect schemes that link the Hong Kong and mainland stock markets. Both schemes are tightly regulated.

61.    On this news, the price of UP Fintech ADSs declined by $0.13 per ADS, or 2.62%, compared to the prior day's closing price, to close at $4.82.

62.     On December 30, 2022, before market hours, *Reuters* published an article entitled "China regulator asks Futu and UP Fintech to Stop Soliciting Mainland Clients."  The article stated, in pertinent part, the following:

China's securities regulator said on Friday that online [brokerage] [. . .] UP Fintech Holding ***[has] conducted unlawful securities businesses, and will be banned from opening new accounts from mainland Chinese investors, sending their shares tumbling***.

The long-awaited official penalty comes more than a year after Chinese official media warned that New York-listed [. . .] UP Fintech, which do not have licences in China, face regulatory risks.

Reuters reported earlier that Chinese officials were planning to ban online brokerages such as [. . .] UP Fintech Holding Ltd from offering offshore trading services to mainland clients.

\* \* \*

[. . .] UP Fintech stock tumbled 32.3% in premarket trade.

***[. . .] UP Fintech Hong Kong ha[s] conducted cross-border securities businesses involving domestic investors without regulatory consent, contravening Chinese laws***, the China Securities Regulatory Commission (CSRC) said in a statement.

***The CSRC will ask the brokerages to take corrective measures, such as to stop soliciting new business from mainland investors***, the watchdog said.

***Although existing Chinese clients will still be allowed to trade via existing platforms, new money must not flow into these accounts unlawfully***, the CSRC added.

[. . .] UP Fintech [does] not have [a] brokerage [licence] on the mainland, but Chinese citizens can open accounts online after submitting personal information related to ID cards and bank cards.

In 2021, a Chinese central banker had warned that online brokerages not licenced in China were acting illegally if they served Chinese clients via the Internet.

It was not immediately clear how the new measures would impact the brokers' future business.

In statements late on Friday, [. . .] UP Fintech said [it] would cooperate with the CSRC and rectify [its] business accordingly. [. . .] while UP Fintech said 90% of

its new clients now come from markets outside mainland China, including Singapore, Hong Kong, and the United States. [. . .]

63.    Also on December 30, 2022, *The Wall Street Journal* released an article entitled "China Regulator Says Futu, UP Fintech Violated Laws," which discussed, in part, how Chinese regulators had warned UP Fintech in late 2021 that it would need to fully comply with Chinese securities laws.  It stated, in pertinent part:

> **China's securities regulator said two Nasdaq-listed online brokers violated its domestic laws by allowing customers on the mainland to make cross-border trades**, stoking concerns that Chinese authorities aren't finished with their crackdowns on private-sector companies.
>
> The American depositary receipts of Up Fintech Holding Ltd., which is also known as Tiger Brokers, fell 29% Friday in New York trading, [. . .] after the China Securities Regulatory Commission put out a statement that mentioned both companies. [. . .] UP Fintech didn't immediately respond to a request for comment.
>
> * * *
>
> Up Fintech [. . .] operate[s] [a] popular retail-trading [app] that [is] similar to that of Robinhood Markets Inc., and are used by individuals in Asia to trade stocks and options listed on major exchanges in the U.S., Hong Kong and other markets. [. . .]
>
> Even though China has strict capital controls, Chinese nationals can open bank accounts in Hong Kong and move up to $50,000 each year offshore. They have also been able to set up brokerage accounts in the city to buy and sell overseas stocks. Up Fintech noted in its most recent annual report that its users and customers were "generally sophisticated Chinese investors living in and outside China."
>
> The CSRC **said the online brokers' act of offering offshore securities-trading services to clients in mainland China doesn't comply with the country's laws and regulations**. It said its officials had discussions with [. . .] **Up Fintech's senior executives in late 2021 and told them to comply with such laws**.
>
> **The regulator also said it was requiring [. . .] Up Fintech to stop taking on or soliciting new domestic clients and customers, who aren't allowed to open accounts.**

The CSRC said it intends to dispatch officers to conduct on-site inspections on [. . .] Up Fintech. They would "supervise and urge the rectification, and take further regulatory measures depending on the rectification," the statement added.

*In October 2021, Chinese state media had called out [. . .] Up Fintech for flouting China's securities and other laws*. A senior official at China's central bank subsequently said cross-border online brokerages in mainland China were operating illegally, adding to a selloff in their ADRs.

64.    On this news, the price of UP Fintech ADSs plummeted by $1.36 per ADS, or 28.5% compared to the prior closing price, to close at $3.41 on December 30, 2022.  The next trading day, UP Fintech ADSs fell another $0.21 per ADS, or 6.15%, to close at $3.20 on January 3, 2023.

65.    On May 16, 2023, during market hours, *Reuters* released an article entitled "Two online brokerages to remove China apps as Beijing data crackdown widens."  The article stated, in pertinent part:

Online brokerage [. . .] UP Fintech Holding Ltd will remove [its app] in mainland China amid Beijing's sharpened focus on data security and capital outflows, triggering a heavy selloff in their New York-listed shares.

*Chinese regulators had warned the [. . .] [firm] as early as 2021 that online brokerages not licensed in China were acting illegally if they served Chinese clients via the internet.*

[. . .] UP Fintech dropped nearly 9% after the announcements, recouping some premarket losses; [the stock has] been under pressure in the last couple of years over regulatory concerns.

*The removal of the [app] is the latest in a series of actions Beijing has taken in the last couple of years to crack down on a wide range of sectors, and data or information security has emerged as a key concern for authorities.*

In the last two months, China clamped down on consultancy and due diligence firms that thrived by providing investors access to industry experts and investigators who could obtain valuable corporate information.

Futu, backed by Chinese internet giant Tencent Holdings Ltd (0700.HK), said on Tuesday its apps would be removed from app stores in China from May 19, while

35

UP Fintech, also known as Tiger Brokers, would do the same with effect from May 18.

Both firms said their existing clients in mainland China would not be affected by the removal of apps.

The removal of [. . .] UP Fintech apps would bar a large number of potential retail investors in mainland China from trading securities easily in markets such as the U.S. and Hong Kong.

Reuters first reported in Dec. 2021 that Chinese officials were planning to ban online brokerages such as Futu and UP Fintech from offering offshore trading services to mainland clients.

Last December, the China Securities Regulatory Commission (CSRC) said Futu and UP Fintech had conducted unlawful securities business and banned them from soliciting new business from mainland investors.

66.     On this news, the price of UP Fintech ADSs declined $0.21 per ADS, or 7.36%, to close at $2.64 on May 16, 2023.

67.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

69.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.    Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

71.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

72.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts constituted violations of the federal securities laws;

(b)    whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c)    whether the price of the Company's securities was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

73.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

74.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the price of the Company's securities.

75.    As a direct result of Defendants' misstatements and omissions alleged herein, the price of the Company's securities was higher than it would have been but for Defendants' misrepresentations and omissions.  Specifically, Defendants' misstatements and omissions increased the price of the Company's securities, maintained the price of the Company's securities, and/or prevented a greater decrease in the price of the Company's securities.

76.    As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal

securities laws.  Defendants' false and misleading statements had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

77.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly. These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

78.    The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

79.    The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD ON THE MARKET DOCTRINE**

80.    At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)    The Company's securities met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b)    As a regulated issuer, the Company filed periodic public reports;

(c)    The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

81.    As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

82.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the

statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

### COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants

83.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

84.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading.  These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

85.    To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

86.    Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

87.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

88.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

89.    Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

90.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

91.    The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements

were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

92.    The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

93.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  May 1, 2024

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

*Counsel for Lead Plaintiff David W. Taylor*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On May 1, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 1, 2024, at Los Angeles, California.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II
