UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAVALE BURNS, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    -against-<br><br>UP FINTECHUP FINTECH HOLDING LIMITED, TIANHUA WU, and JOHN FEI ZENG.,<br><br>        Defendants. | 24-CV-1632 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

  Plaintiff Lavale Burns brings this action on behalf of all persons and entities who purchased or acquired shares of UP Fintech Holding Limited between April 29, 2020 and May 16, 2023. Each year, UP Fintech, an integrated financial technology platform that offers online brokerage services internationally, including in China, files annual reports with the Securities and Exchange Commission. From 2019 through 2022, the company's annual reports stated that it was in compliance with securities laws and regulations in China, notwithstanding substantial uncertainties in the legal and regulatory landscape there. Beginning in 2021, a series of news articles were published suggesting that UP Fintech's operation without a license may be in violation of Chinese laws and regulations. After the articles were published, UP Fintech's share price decreased substantially. UP Fintech did not receive any formal notice of noncompliance until December 2022, and in January 2023, the law in China was changed to explicitly require companies like UP Fintech to operate with a license.

  On June 20, 2023, Plaintiff filed a complaint naming UP Fintech and two of its chief officers as Defendants, asserting that the company made numerous false and misleading representations and half-truths regarding the legality of UP Fintech's operations in China and the

risk it imposed on Plaintiff and all other similarly situated persons who held securities in the company. Plaintiff brings claims under the Securities Exchange Act Sections 10(b) and 20(a), and under Rule 10b-5. Defendants now seek dismissal of the complaint, arguing that none of their statements were false or misleading. The Court agrees. The disclosures adequately warned investors of the risks and uncertainties in the legal landscape in China. Plaintiff fails to plausibly allege that the Company knew more than what it disclosed about the risks or that the disclosures were otherwise false or misleading.

For these reasons and those stated below, the Court GRANTS Defendant UP Fintech's motion to dismiss, but GRANTS Plaintiff leave to amend the complaint.

## BACKGROUND

The facts are primarily set forth as alleged in the Amended Complaint, ECF No. 73,[1] and are viewed in the light most favorable to Plaintiff. *See Okoh v. Sullivan*, 441 F. App'x 813 (2d Cir. 2011) ("Under Rule 12(b)(6), we construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."). The Court also considers documents incorporated into the Amended Complaint by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal citations and quotations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Id.*

---

[1] All ¶ references herein refer to the Amended Complaint ("Am. Compl.") unless otherwise noted.

I.    Facts

   A.  UP Fintech's Business

UP Fintech Holding Limited ("UP Fintech" or the "Company") is an integrated financial technology platform that provides cross-market, multi-product investment opportunities for global investors. ¶¶ 2, 19. The Company's revenue is derived from customer commission fees for securities trading, earned interest income, or financing services fees. ¶¶ 3, 20. Defendant Tianhua Wu ("Wu")  has been the Company's Chief Executive Officer since January 2018, and Defendant John Fei Zeng ("Zeng," together with Wu, the "Individual Defendants") has been the Company's Chief Financial Officer since October 2018. ¶¶ 10–12. Both Individual Defendants, as senior executives or directors of the Company, were privy to confidential and proprietary information during the Class Period. ¶ 14. Furthermore, the Individual Defendants "were able to, and did, directly or indirectly, control" UP Fintech's business activities. ¶ 15.

   B.  Disclosure Reports

From 2019 to 2022, UP Fintech filed its Annual Reports on Form 20-F with the Securities Exchange Commission ("SEC"). ¶¶ 21, 28, 35, 45. Each Annual Report was "signed by Defendants Wu and Zeng, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud." *Id.*

The Annual Reports from 2019 through 2021 contain nearly identical risk disclosure statements with respect to the Company's operations in People's Republic of China ("China" or "PRC"). ¶¶ 22, 29, 36. The statements began by articulating that the Company might not be able to obtain or maintain the necessary licenses for their activities in multiple jurisdictions, especially in PRC. *Id*. They then acknowledge that while the regulatory authorities in China

3

might take the position that UP Fintech was required to obtain licenses, the Company's legal counsel advised that the Company's activities did not require a securities brokerage license or permit. *Id.* Then, the reports communicated the potential for new laws and regulations to impact the Company's business and stressed that there may be substantial uncertainty regarding their application to UP Fintech. *Id.*

In a subsequent paragraph, the statements described an investor alert posted by the China Securities Regulation Commission ("CSRC") on their website in July of 2016. *Id.* The post warned that, except for select investment channels that have been approved by the CSRS, all other institutions that provided services for Chinese investors to participate in oversees securities trading were not approved. *Id.* The statement continued to explain that in September 2016, UP Fintech received a rectification notice from the Beijing branch of the CSRC. *Id.* The Company's statements indicate that it took action to comply with the CSRC's requirements and provided the relevant information to the authorities. *Id.* The Company disclosed that it could not make assurances it would not be subject to further investigation and that additional rectifications might adversely affect the business. *Id.* Finally, the statement explained that if the Company was required to and could not obtain necessary approvals, the Company might fail to develop new business, be fined, have gains confiscated, have activities suspended, or be subject to claims for compensation of any economic loss suffered by customers or other parties. *Id.*

The 2019–2021 Annual Reports also contained a disclosure section regarding Chinese security laws. ¶¶ 24, 31, 41. The section acknowledged that if UP Fintech did not comply with the laws and regulations of the PRC, penalties, confiscation of illegal proceeds, fines, or termination of business may result. *Id.* Another section noted that the Company is subject to a myriad of regulatory bodies, though it did not specifically identify China or the CSRC as one of

4

them. ¶¶ 26, 33, 43. Additionally, the Company expressed that compliance turned upon UP Fintech's internal system of compliance but despite this, "violations could still occur." *Id.*

Both the 2021 and 2022 Annual Reports included additional paragraphs about potential intervention by the Chinese Government. ¶¶ 39, 50. The 2021 Annual Report noted that the PRC government had recently indicated an "intent to exert more oversight and control over overseas securities offerings" that could adversely affect UP Fintech at any time. ¶ 39. The disclosure described recent opinions, draft provisions, and draft administrative measures that could apply to UP Fintech's business and materially and adversely affect the Company. *Id.* The 2022 Annual Report further explained that Overseas Listing Trial Measures had been adopted by the CSRC, changing the regulatory regime for securities offerings. ¶ 50. Nonetheless, the Company stated that the interpretation and application of the new regulations were unclear. *Id.* Therefore, the Company could not assure that UP Fintech would "be able to complete the filings and fully comply with the relevant new rules on a timely basis, if at all." *Id.*

The 2022 Annual Report additionally chronicled a December 30, 2022 rectification action (the "1230 Notice") raised by the CSRC and directed at UP Fintech's activities. ¶¶ 46, 48. The 1230 Notice stated that UP Fintech did not have the necessary approvals for cross-border security business and thus its activities were illegal under the securities law of the PRC. *Id*. The report said that the Company was pursuing and might continue to pursue rectification measures. *Id.* The report reiterated that if the CSRC was not satisfied with the Company's rectification measures, the business might be materially and adversely affected. *Id*. The 2022 Annual Report also explained that two weeks after the 1230 Notice, "[o]n January 13, 2023, the CSRC promulgated the Measures for the Administration of the Securities Brokerage Business, which became effective on February 28, 2023." *Id.* ¶ 48. This new regulation articulated that an

overseas business entity that conducts cross-border securities trading services in the PRC must obtain government approval to do so. *Id.*

    C.  News Articles

From October 2021 through May 2023, there were a series of articles published by news sources with respect to UP Fintech and the PRC's regulatory crackdowns. ¶¶ 58, 60, 62, 63, 65. The articles reported on the increased attention from Chinese regulators on unlicensed cross-border trading. *Id.* Each article suggested or explicitly stated that UP Fintech's business in China was violating the law. *Id.*

First, on October 28, 2021, *The Wall Street Journal* published an article titled "Chinese Online Broker Shares Dropped After Criticism From Central Bank." ¶ 58. The article stated that Sun Tianqi ("Tianqi"), head of the financial stability department at People's Bank of China, said that offering securities-brokerage services to mainland Chinese investors without obtaining the required licenses was "illegal financial activity." *Id.* The article reported that Tianqi's announcement negatively affected UP Fintech's stock. *Id.*

Two months later, on December 17, 2021, *Reuters* published an article titled "EXCLUSIVE Next in China Regulatory crackdown: online brokers- sources." ¶ 60. The article said that Chinese officials were planning to ban online brokerages, like UP Fintech, from offering offshore trading services to mainland clients. *Id.* Citing an anonymous source, the article claimed that companies affected by the "latest crackdown" were likely to be notified of a ban in the coming months. *Id.*

The following year, on December 30, 2022, both *Reuters* and *The Wall Street Journal* reported that China's securities regulator said that UP Fintech's offering of offshore securities-trading services to clients did not comply with PRC laws and regulations. ¶¶ 62, 63. The *Reuters*

article, "China regulator asks Futu and UP Fintech to Stop Soliciting Mainland Clients," stated that a Chinese central bank warned that online brokerages not licensed in China were operating illegally. ¶ 62. In a similar vein, *The Wall Street Journal* article, "China Regulator Says Futu, UP Fintech Violated Laws," asserted that the CSRC said its officials spoke with UP Fintech's senior executives in late 2021 telling them to comply with PRC laws. ¶ 63.

*Reuters* published another article, "Two online brokerages to remove China apps as Beijing data crackdown widens," on May 16, 2023. ¶ 65. The article claimed that "Chinese regulators had warned [UP Fintech] as early as 2021 that online brokerages not licensed in China were acting illegally if they served Chinese clients via the internet." *Id.*

After these news stories were published, UP Fintech's American Depositary Shares traded on the NASDAQ exchange fell in price. ¶¶ 59, 61, 64, 66. Just before the first article was published in October 2021, UP Fintech's stock was being traded at $8.85 per share and when the last article in the Class Period was published, in May 2023, Fintech's stock price closed at $2.64. ¶¶ 59, 66.

## II. Procedural History

Plaintiff Burns initiated this action individually and on behalf of all others similarly situated, on June 20, 2023, in the United States District Court, Central District of California. ECF No. 1. On January 30, 2024, Judge Marshall appointed David W. Taylor as Lead Plaintiff.[2] ECF No. 56. The matter was transferred to this Court on March 4, 2024. ECF No. 62. On May 1, 2024, Plaintiff filed an Amended Complaint. ECF No. 73. On July 12, 2024, the Company moved to dismiss the amended complaint. ECF No. 74; ECF No. 75 ("Mem."). Plaintiff filed an

---

[2] The Court uses "Plaintiff" interchangeably to refer to both Plaintiff Burns and Lead Plaintiff Taylor.

opposition on September 10, 2024. ECF No. 77 ("Opp."). On October 25, 2024, Defendant UP Fintech filed its reply. ECF No. 78 ("Reply").

## LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Plaintiffs alleging securities fraud claims must satisfy the "heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b) to withstand a motion to dismiss. *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant "made misleading statements and omissions of a material fact and acted with the required state of mind." *Id.* at 305 (cleaned up). As usual, the Court accepts the complaint's allegations as true; however, allegations must be pleaded with particularity. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

## DISCUSSION

The Court first finds that Plaintiff has failed to sufficiently allege Section 10(b) and Rule 10b-5 violations against Defendants. Second, because Plaintiff cannot establish this claim as

alleged, Plaintiff's Section 20(a) and control person liability claims likewise fail. The Court, however, will grant Plaintiff leave to amend.

I.      **Plaintiff Fails to State a 10(b) Claim**

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,* 28 F.4th 343, 351–52 (2d Cir. 2022) (citing *Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013)). The Company contests only the first two requirements: material omissions and scienter. The Court first addresses Defendants' alleged material omissions and finds that Plaintiff fails to plead an actionable misstatement or omission. As such, the court need not, and declines to, consider the parties' scienter arguments.

"[T]here is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact[.]" *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (internal citations and quotation marks omitted). But "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* That obligation is triggered once a defendant puts the topic "in play," based on "an examination of defendants' representations, taken together and in context." *Id.* at 250–51 & n.3 (internal citations and quotation marks omitted); *Setzer v. Omega Healthcare Invs.*, Inc., 968 F.3d 204, 214 n.15 (2d Cir. 2020); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010); s*ee also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding that once a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information") (internal citations and quotation

marks omitted). "[H]alf-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016).

Even if "literally true," affirmative statements may be rendered false by what they fail to disclose. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). Such misleading statements are actionable if there is a substantial likelihood that a reasonable investor would find the omitted information important in making an investment decision." *See United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (internal citation omitted); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (finding that the materiality requirement "is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available") (internal citations and quotation marks omitted).

However, "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). This is because a "reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement." *Id.* Therefore, establishing liability on this theory of omission related to opinion statements is "no small task for an investor to meet." *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 318 (S.D.N.Y. 2020) (internal citation and quotation marks omitted).

Plaintiff asserts that the Company's risk disclosures in their Annual Reports were "materially false and misleading and/or constituted a half-truth" because: (1) it materially misrepresented the level of risk of operating unlicensed in China, (2) discussed future penalties in general, hypothetical terms, rather than as being likely due to the Company's failure to obtain

the required Chinese license, and (3) it did not state that the CSRC was a major regulatory body that could bring enforcement action against the Company due to its unlicensed activities in China." Am. Compl. at 7–10; *see* Opp. at 9–11. Plaintiff further contends that Defendants' Sarbanes-Oxley Act ("SOX") certifications were false and misleading because: (1) a senior official at China's central bank said that online brokerages operating in China were illegal, (2) Defendants were aware that Chinese officials were planning to ban online brokerages from offering offshore trading services to mainland clients, and (3) Chinese regulators had warned UP Fintech's senior executives of the company's failure to comply with Chinese securities law in 2021. Opp. at 11–12.

### A. Plaintiff Fails to Adequately Plead That Defendants Made Materially False or Misleading Statements or Omissions in Their Annual Reports

Plaintiff fails to adequately plead that the Company made materially false or misleading statements or omissions in their Annual Reports for at least four reasons.

First, the Annual Reports sufficiently warned investors about the risks of their activities in China. "Corporate officials need not [be] clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Elliott Assocs., L.P. v. Covance, Inc.*, No. 00-CV-4115 (SAS), 2000 WL 1752848, at *8 (S.D.N.Y. Nov. 28, 2000) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)); *see also Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) ("Corporations do not, as a general matter, have a duty 'to disclose uncharged, unadjudicated wrongdoing.'") (quoting *Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014)).

Here, the Company disclosed that they did not have a license to operate in China, and that, based on the advice of counsel, they did not believe they needed one under existing laws. However, the disclosures made clear that PRC government might disagree, and they may require a license or other approvals that the company may not be able to obtain. ¶¶ 39, 50. The Company's 2021 Annual Report, filed on April 28, 2022, and 2022 Annual Report, filed on April 26, 2023, also both state that China intended to "exert more oversight and control over overseas securities offerings and other capital markets activities and foreign investment in China-based companies." *Id.* Furthermore, all of the Annual Reports reference "substantial uncertainties" with respect to the interpretation and application of current and future PRC laws. *See* ¶¶ 22, 29, 36, 50. Plaintiff has not alleged that there was any explicit law that the Company was in violation of that would have rendered these disclosures false, nor any PRC findings of wrongdoing.[3] Instead, the CSRC sent a notice in December 2022 finding that UP Fintech's activities were illegal and later adopted a regulation in this regard. But, as to UP Fintech's prior, allegedly misleading disclosures, "the specific risk that [Defendant] warned against . . . had not materialized at that point, [cutting] against the notion that the[] statements were misleading." *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 349 (S.D.N.Y. 2024). As such, the Company adequately disclosed risk in these reports, which were not misleading nor false.

Second, none of the media articles referenced in the Complaint demonstrate that the Company knew that it was in violation of Chinese law, as Plaintiff suggests. The October 2021

---

[3] To the extent Plaintiff refers to the 2016 rectification notice, the Company's 2021 and 2022 Annual Reports state that after a September 2016 rectification notice from the CSRC, the Company has occasionally communicated with the Beijing branch of the CSRC to ensure that the Company follows CSRC's requirements. ECF No. 76-2 at 26; ECF No. 76-3 at 80. In both annual reports, the Company further stated that they believed they had taken the necessary measures in response to such the 2016 rectification notice and had not received any further inquiry or rectification requirement from the CSRC." *Id.*

12

article references Sun Tianqi's speech at a Shanghai forum and describes him as a senior official at China's central bank. *See* ¶ 58. Plaintiff makes no allegation that Tianqi was a legal authority or that his statements were binding upon the Company. *See In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478 (NRB), 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) ("[T]o be actionable, the representation must be one of existing fact, and not merely an expression of opinion, expectation or declaration of intention.") (internal citation omitted).

      Furthermore, the December 30, 2022 and May 16, 2023 articles state only that the CSRC officials had discussions with UP Fintech's senior executives in late 2021 and told them to comply with PRC's securities laws and regulations. ECF Nos. 76-8, 76-7. The articles do not identify the sources of this information nor the contents of the discussions. "[T]he articles provide no basis for believing that the unidentified source is likely to have known the relevant facts." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008). Therefore, this article cannot be used to suggest that UP Fintech's senior executives knew they were acting in violation of PRC law at the time of the disclosures—particularly, where there were no allegations of official actions being taken against UP Fintech and where Plaintiff identifies no law that UP Fintech had violated at that time. Moreover, "there is no duty to disclose information that has been widely reported in readily available media." *Monroe Cnty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 349 (S.D.N.Y. 2014) (internal citations and quotation marks omitted); *see also Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) ("[W]hen the [relevant subject matter] has been widely reported in readily available media, shareholders may be deemed to have constructive notice of the facts reported, and the court may

take this into consideration in determining whether representations . . . are materially misleading.").

Third, many of the allegedly false or misleading statements identified by Plaintiff are also non-actionable opinions. These statements include that the Company believed certain laws and regulations were "not required or applicable to [their] business activities," their "current supporting activities do not require a securities brokerage license or permit under the existing PRC securities laws and regulations," and they "have taken necessary measures in response to [the CSRC rectification] notice." *See, e.g.*, ¶¶ 22, 24. Plaintiff argues that the Company's statements of opinion are actionable because the Company "omitted information whose omission made their statements misleading to a reasonable investor." Opp. at 14. However, "[t]o prevail on such a claim, the investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d at 318 (internal citation and quotation marks omitted). As discussed *supra*, the Company issued robust disclosures which were not untrue nor believed to be false by the Company. *Cf. Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) ("[L]iability for making a false statement of opinion may lie if either the speaker did not hold the belief she professed or the supporting fact[s] she supplied were untrue.") (internal citation and quotation marks omitted). "Defendants were only tasked with making statements that fairly aligned with the information in the issuer's possession at the time," and they did. *Id.* at 212. (cleaned up). Plaintiff was made aware of the potential risks and the actual law applicable at the time of the Annual Reports.

14

Fourth, a nearly identical case—*Henry v. Futu Holdings Limited*—further demonstrates why Plaintiffs have failed to prove an actionable misstatement or omission. *See Henry v. Futu Holdings Ltd.*, No. 23-CV-03222 (BRM) (CLW), 2024 WL 4285129 (D.N.J. Sept. 25, 2024). There, Plaintiffs sued Futu Holdings Limited ("Futu") under Sections 10(b) and 20(a) of the Securities Exchange action and Rule 10b-5, alleging that Futu, an online brokerage service with a similar business operating in PRC, "falsely and misleadingly reassured investors that it was operating in China legally." *Id.* at *3 (cleaned up). Plaintiff Henry adduced the same October 28, 2021, December 17, 2021, and December 30, 2022 articles and Futu's annual reports contained similar cautionary language to UP Fintech's Annual Reports. *Id.* at *3–5. Considering the parties' arguments, the Court held that Plaintiffs did not allege with sufficient particularity that Futu's statements "regarding their then-current beliefs that they were in compliance with PRC Securities Law and related regulations and that they did not need a brokerage license in China—were false or otherwise misleading at the time they were made," or that Futu had any duty to disclose uncharged, unadjudicated wrongdoing. *Id.* at *15, 17. This Court agrees that the conclusion likewise applies here.

Accordingly, the Amended Complaint fails to plausibly allege an actionable misstatement or omission, and the motion is GRANTED in this respect. Because the Court finds that Plaintiff fails to sufficiently plead the first element of securities fraud, the Court need not analyze the parties' arguments regarding scienter. *See Saskatchewan Healthcare Emps. Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 390 (S.D.N.Y. 2024) ("Because the failure to establish any element is fatal to a section 10(b)/Rule 10b-5 claim, the Court need not address Defendants' other arguments for the dismissal of the Lead Plaintiff's Exchange Act claims.") (internal citations and quotation marks omitted); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144,

172 (S.D.N.Y. 2015) (holding that plaintiff's failure to adequately plead misstatement or omission is dispositive, such that the Court need not reach the remaining Section 10(b) factors).

### B. The Alleged Misstatements and Omissions in the Company's SOX Certifications Also Fail to State a Claim

Attached to each of the Annual Reports, the Company filed certifications pursuant to the Sarbanes-Oxley Act of 2002, signed by the Individual Defendants "attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud." ¶¶ 21, 28, 35, 45. Because Plaintiff fails to adequately plead an actionable misstatement or omission regarding the Annual Reports, Plaintiff's claim based on the SOX certifications necessarily fails. *In re Glob. Brokerage, Inc.*, No. 17-CV-916 (RA), 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019) (holding that defendants cannot be held liable for their SOX certifications with respect to statements where a plaintiff fails to adequately allege actionable misstatements or omissions); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) ("SOX certifications . . . do not constitute a standalone basis for liability.").

## II. Plaintiff's Control Person Liability Claim Fails as a Matter of Law

Plaintiff alleges that the Individual Defendants violated Section 20(a) of the Securities Exchange Act. To state a claim under Section 20(a), a plaintiff must allege facts showing: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Defendants assert that "Plaintiff's control person claims under Section 20(a) are not directly at issue on this motion because none of the Individual Defendants named in those claims has been served," but nevertheless, the Section 20(a) claims fail as a matter of law. Mem. at 10 n.6. This

Court agrees. *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 656 (S.D.N.Y. 2015) ("Given that a control person liability claim under § 20(a) is predicated on a primary violation of the securities laws, the control person liability claims must be dismissed because Plaintiff has failed to allege a primary violation under § 10(b)."). Plaintiff's Section 20(a) claim is therefore DISMISSED.

### III.  Plaintiff's Request for Leave to Amend Is Granted

In opposition, Plaintiff cursorily seeks leave to amend again if the Court grants any part of the motion, without stating why justice so requires or specifying how they would cure any pleading deficiencies in the amended complaint. Opp. at 25. Defendants oppose this request. Reply at 10. Nonetheless, "courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI Commc'ns, Inc.*, 493 F.3d at 108; *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.") (internal citation and quotation marks omitted); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003) (noting that the policy of permitting a plaintiff to replead his case is "especially appropriate in the context of claims dismissed under Rule 9(b) because the law favors resolving disputes on their merits."). Though Plaintiff has amended the complaint once as a matter of right, Plaintiff has not before sought leave to replead. Because it is possible that Plaintiff can plead additional facts to remedy the deficiencies identified in this opinion without prejudice to Defendants, Plaintiff is granted leave to amend.

### CONCLUSION

For the reasons stated herein, the motion to dismiss is GRANTED. The Court GRANTS Plaintiff leave to amend the Complaint and ORDERS Plaintiff to file an amended complaint by

**April 21, 2025**. If Plaintiff fails to do so, the action will be dismissed with prejudice. The Clerk of Court is respectfully directed to terminate ECF No. 74.

Dated: March 27, 2025
       New York, New York

SO ORDERED.

*Jessica Clarke*

JESSICA G. L. CLARKE
United States District Judge