UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAVALE BURNS and DAVID W. TAYLOR, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>         -against-<br><br>UP FINTECH HOLDING LIMITED, TIANHUA WU, and JOHN FEI ZENG,<br><br>                Defendants. | 24-CV-1632 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

Plaintiffs Lavale Burns and David W. Taylor bring this action on behalf of all persons and entities who purchased Defendant UP Fintech Holding Limited's ("UPF's") securities between April 29, 2020, and May 16, 2023. This Court previously dismissed Plaintiffs' Amended Complaint, but granted Plaintiffs leave to amend. Plaintiffs filed a Second Amended Complaint, reasserting their claims under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5. Because Plaintiffs failed to allege that UPF made actionable misrepresentations or omissions, this Court dismisses Plaintiffs' claims with prejudice.

**BACKGROUND**

The Court assumes familiarity with the underlying facts of this case as laid out in its previous order dismissing Plaintiffs' First Amended Complaint. ECF No. 82 ("Order"). The facts are primarily set forth as alleged in the Second Amended Complaint, ECF No. 83 ("SAC"), and are viewed in the light most favorable to the Plaintiff. *See Okoh v. Sullivan*, 441 F. App'x 813, 813 (2d Cir. 2011) ("Under Rule 12(b)(6), we construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."). The Court also considers documents incorporated into the SAC by reference.

*See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." (internal citations and quotations omitted)). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Id.*

I.    **Facts**

a.  **UPF's Business**

Defendant UPF is an "integrated financial technology platform providing a cross-market, multi-product investment experience for investors globally." SAC ¶ 2. UPF is incorporated in the Cayman Islands and has its principal places of business in Beijing, People's Republic of China ("China" or "PRC") and Singapore. *Id.* ¶ 14. UPF's major operating subsidiary, Tiger Brokers (NZ) Limited ("Tiger Brokers"), was registered in New Zealand. *Id.* ¶ 3. Defendant Tianhua Wu has served as UPF's Chief Executive Officer ("CEO") and as a Director since January 2018, while Defendant John Fei Zeng (with Wu, the "Individual Defendants") has served as UPF's Chief Financial Officer ("CFO") and as a Director since October 2018. *Id.* ¶¶ 15–16.

b.  **Investigation by New Zealand's Financial Markets Authority**

In October 2019, New Zealand's Financial Markets Authority ("FMA"), a government agency responsible for financial regulation, inspected Tiger Brokers for potential violations of New Zealand's Anti-Money Laundering and Countering Financing of Terrorism Act 2009 ("AML/CFT Act"). *Id.* ¶ 28. In December 2019, Tiger Brokers received the FMA's inspection report, and on March 20, 2020, the FMA issued a formal warning to Tiger Brokers for "failing to have several adequate anti-money laundering protections in place." *Id.* ¶¶ 28, 31. On April 6,

2020, the FMA publicly announced that it had issued this warning. *Id.* ¶ 31. The FMA

"concluded [that] there were reasonable grounds to believe [that Tiger Brokers] had

contravened" the AML/CFT Act. *Id.* The FMA also stated that "[t]he severity of Tiger Brokers'

likely breaches" necessitated the formal warning. *Id.*

### c.  UPF's Disclosure Reports

On April 29, 2020, weeks after the FMA's public notice of its Tiger Brokers warning,

UPF filed its Form 20-F for the year ending December 31, 2019 ("2019 Annual Report"), which

disclosed information about its compliance with applicable laws in various jurisdictions,

including New Zealand; the FMA's 2019–2020 inspection of Tiger Brokers; and signed

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). *Id.* ¶¶ 26–30. Relevant

excerpts of the 2019 Annual Report include:

> Non-compliance with applicable laws or regulations could result in
> sanctions to be levied against us, including fines and censures,
> suspension or expulsion from a certain jurisdiction or market or the
> revocation or limitation of licenses, which could adversely affect our
> reputation, prospects, revenues and earnings . . . .
>
> We face risks related to our status as an anti-money laundering
> reporting entity in New Zealand and if the Financial Markets
> Authority finds fault with our AMLCFT programs and engages in
> enforcement actions against us, our business and reputation may be
> adversely affected.
>
> Tiger Brokers (NZ) Limited ("TBNZ") was visited by the FMA for
> an Anti-Money Laundering/Combating the Financing of Terrorism
> ("AMLCFT") inspection in October 2019. The FMA report of the
> inspection was received in December 2019 and then in April 2020,
> FMA had issued a formal public warning, being of the opinion that
> TBNZ had breached some of its AMLCFT obligations. The FMA
> provided a list of remedial actions which TBNZ must complete to
> ensure compliance with the AMLCFT legislation. TBNZ must
> complete all actions required in the public warning by September
> 30, 2020 or such other date as agreed to in writing by the FMA. The
> FMA have not indicated that any additional enforcement measures
> are contemplated at the moment. We submitted the plan to the FMA

3

> on April 17, 2020 according to the requirements of the FMA describing how and when it will amend the issues to become compliant and we are still waiting for the responses from the FMA up to date . . . .
>
> The warnings do not suggest that the businesses have allowed or enabled illegal activity to take place.

*Id.* ¶¶ 27–29.

On April 28, 2021, UPF filed its Form 20-F for the year ending December 31, 2020 ("2020 Annual Report"). *Id.* ¶ 40. UPF's 2020 Annual Report disclosed information regarding UPF's unlicensed operations in China, changes to Chinese securities laws, and general regulatory risk. *Id.* ¶¶ 40–42; *see* ECF No. 73 ("Am. Compl.") ¶¶ 29, 31 (identifying substantially identical excerpts of the 2020 Annual Report). The 2020 Annual Report also disclosed information about the FMA's October 2019 inspection of Tiger Brokers and subsequent April 2020 public issuance of a formal warning:

> Some of our subsidiaries are required to comply with regulatory anti-money laundering requirements. For example, TBNZ was visited by the FMA for an Anti-Money Laundering/Combating the Financing of Terrorism ("AMLCFT") inspection in October 2019. In April 2020, FMA had issued a formal public warning (the "Warning Letter"), which identified potential violations of the AMLCFT caused by historical control weaknesses. The FMA provided a list of remedial actions which TBNZ must complete to ensure compliance with the AMLCFT legislation. TBNZ, with the assistance of professional advisers, had completed all actions required in the Warning Letter by September 30, 2020 as confirmed by the FMA. Since the publication of the Warning Letter, the FMA has also taken a number of steps, including seeking, on a private basis, the production by TBNZ of certain documents and information. TBNZ is cooperating with the FMA and has responded to the FMA's requests with the assistance of professional advisers, including New Zealand counsel. TBNZ cannot predict the duration, outcome, or impact of the FMA investigation. According to the Warning Letter, the FMA reserves its right to pursue civil enforcement actions against TBNZ, including but not limited to civil penalties for any breach of the AMLCFT Act caused by historical control weaknesses. Each pecuniary penalty ordered could be up to

4

> NZ$2 million. There can be no assurance that the FMA will not take further enforcement action against us for past violation. If the FMA engages in enforcement actions against us, our business and reputation may be adversely affected . . . .
>
> On April 6, 2020, the FMA publicly issued a formal warning to Tiger Brokers (NZ) Limited which stated that it had reasonable grounds to believe that Tiger Brokers (NZ) Limited had engaged in conduct constituting a civil liability act under the AML/CFT Act. The formal warning stated that its issuance did not affect the FMA's ability to consider or impose other appropriate sanctions under the AML/CFT Act. On March 20, 2020, prior to publishing the formal warning, the FMA notified Tiger Brokers (NZ) Limited that it had opened an investigation into Tiger Brokers (NZ) Limited's AML/CFT Act compliance, which is ongoing. The FMA's formal warning required Tiger Brokers (NZ) Limited to carry out remedial actions in relation to its AML/CFT Act compliance, which were completed in time by September                    30,                    2020.

SAC ¶¶ 43–44.

On April 28, 2022, UPF filed its Form 20-F for the year ending December 31, 2021 ("2021 Annual Report"). SAC ¶ 52. The 2021 Annual Report included disclosures regarding UPF's unlicensed activities in China, the likelihood of Chinese government intervention, Chinese securities laws, and UPF's general regulatory risk. SAC ¶¶ 52–56; *see* Am. Compl. ¶¶ 36, 39, 41, 43 (identifying substantially identical excerpts of the 2021 Annual Report).

On December 21, 2022, the FMA filed civil High Court proceedings against Tiger Brokers for breach of the AML/CFT Act. SAC ¶ 63. "The matter proceeded to a penalty hearing before the High Court where the parties jointly submitted that Tiger Brokers should be ordered to pay a pecuniary penalty of $900,000." *Id.* On June 29, 2023, the Auckland High Court announced its order that Tiger Brokers to pay $900,000 for breaching the AML/CFT Act. *Id.* ¶ 90.

On April 26, 2023, UPF filed its Form 20-F for the year ending December 31, 2022 ("2022 Annual Report"). *Id.* ¶ 64. The 2022 Annual Report included disclosures regarding UPF's

unlicensed activities in China, the likelihood of Chinese government intervention, Chinese securities laws, and UPF's general regulatory risk. *Id.* ¶¶ 64–68; *see* Am. Compl. ¶¶ 46, 48, 50, 52 (including substantially identical excerpts of the 2022 Annual Report). The 2022 Annual Report also included disclosures regarding the New Zealand court proceedings. UP Fintech Holding Ltd., Annual Report (Form 20-F), 55 (April 26, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001756699/000095017023014775/tigr-20221231.htm.

### d. Confidential Witnesses

Like in the First Amended Complaint, Plaintiffs also allege information based on communications with former UPF employees. SAC ¶ 8; Am. Compl. ¶¶ 55–57. As alleged in the First Amended Complaint, Plaintiffs identify "CW1," UPF's "Head of Business Development" from September 2017 to July 2020. SAC ¶ 35; Am. Compl. ¶ 55. CW1 allegedly observed numerous illegal business practices, including UPF's November 2020 inducement of customers to purchase UK stock by falsely claiming that UPF's stock price would imminently rise. SAC ¶¶ 35–37, 49, 61, 73; Am. Compl. ¶¶ 55–57.

Additionally, Plaintiffs newly identify "CW2," Tiger Brokers' Project Manager from February 2019 to September 2019. SAC ¶ 38. CW2 reported that Tiger Brokers' CEO, Vincent Cheung, denied CW2's request of NZ$10 million to obtain accreditation in New Zealand, while expecting accreditation to occur within six months, "which CW2 considered to be unrealistic, particularly with the lack of staff at Tiger Brokers at the time." *Id.* ¶¶ 39, 50, 62, 74. Plaintiffs allege that CW1's and CW2's anonymous reports "demonstrate that Defendants were, at the very least, deliberately reckless with respect to their management of [UPF's] operations." *Id.*

### e.  News Articles

Plaintiffs also identify multiple news articles from October 2019 through May 2023 regarding UPF's noncompliance with Chinese financial regulations. *Id.* ¶¶ 6–7, 32–34, 47–48, 51, 59–60, 71–72, 75–83. Specifically, on October 16, 2019, GeoInvesting, "a small company that conducts research regarding microcap investing," published a report entitled "UP Fintech Holding Ltd. – TIGR – is a U.S. Listed China Based Company Operating an Illegal Money Laundering Scheme" ("GeoInvesting Report"). *Id.* ¶¶ 6, 32–33. The GeoInvesting Report stated that UPF was "operating without the proper license(s) required for Chinese citizens to trade foreign securities and has already been subject to a government investigation by the China Securities Regulatory Commission (CSRC)." *Id.* ¶ 6. The GeoInvesting Report also stated that UPF attempted to facilitate efforts by Chinese citizens to circumvent Chinese capital control laws. *Id.* ¶¶ 6–7, 32–34, 47–48, 59–60, 71–72.

Plaintiffs also reassert their allegations regarding October 28, 2021 and December 30, 2022 articles published by *The Wall Street Journal*, *id.* ¶¶ 75, 80, and October 28, 2021, December 17, 2021, December 30, 2022, and May 16, 2023 articles published by *Reuters*, *id.* ¶¶ 75, 77, 79–80, 82. *See also* Am. Compl. ¶¶ 58, 60, 62–63, 65 (substantively identically pled). These news articles reported on the increased attention from Chinese regulators on unlicensed cross-border trading. *Id.* Plaintiffs allege that following the publication of each of these articles, UPF's American Depositary Shares ("ADS's") traded on the NASDAQ exchange fell in price. SAC ¶¶ 75–83; *see also* Am. Compl. ¶¶ 58–66 (substantively identically pled).

### f.  UPF's Press Releases

UPF issued various press releases from 2021 to 2023. SAC ¶¶ 84–89. The subjects of these press releases were the February 2021 resignation of Chenglong Zhu, a Director of UPF, *id.*

¶ 84; the June 2021 UPF public offering of ADS's, *id.* ¶¶ 85–86; the October 2021 acquisition of Ocean Joy Securities Limited, *id.* ¶ 87; the March 2022 resignations of Directors Xian Wang and David Friedland, *id.* ¶ 88; and the May 2023 changes to the user terminals for existing Chinese clients and the cessation of applications from new Chinese mainland users, *id.* ¶ 89.

## II.     Procedural History

On June 20, 2023, Plaintiff Burns, individually and on behalf of all others similarly situated, initiated this action in the United States District Court for the Central District of California. ECF No. 1. On January 30, 2024, Plaintiff Taylor was appointed as a lead plaintiff. ECF No. 56. The matter was transferred to this Court on March 4, 2024. ECF No. 62. On May 1, 2024, Plaintiffs filed an Amended Complaint. Am. Compl. On July 12, 2024, Defendants moved to dismiss the Amended Complaint, ECF No. 74, which the Court granted on March 27, 2025, Order. However, the Court granted Plaintiffs leave to amend. Order at 17.

On April 21, 2025, Plaintiffs filed the operative Second Amended Complaint. *See* SAC. Plaintiffs reassert their claims that Defendants violated Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. SAC ¶¶ 107–17. On July 1, 2025, Defendants again moved to dismiss this action. ECF No. 90; ECF No. 91 ("Mot."). On August 29, 2025, Plaintiffs opposed this motion to dismiss. ECF No. 93 ("Opp."). On October 16, 2025, Defendants filed their reply memorandum of law. ECF No. 94.

## LEGAL STANDARD

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion

only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Plaintiffs alleging securities fraud claims must satisfy the "heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b) to withstand a motion to dismiss. *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant "made misleading statements and omissions of a material fact and acted with the required state of mind." *Id.* at 305 (cleaned up). As usual, the Court accepts the complaint's allegations as true; however, allegations must be pleaded with particularity. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

## DISCUSSION

First, the Court finds that Plaintiffs have failed to allege their claims under Section 10(b) and SEC Rule 10b-5. Second, the Court accordingly concludes that Plaintiffs' derivative 20(a) and control person liability claims must also fail.

### I.     Plaintiffs Fail to Allege Section 10(b) Claims

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this provision by making it unlawful to "make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading."

17 C.F.R. § 240.10b-5(b).

"To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a

misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale

of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Ark. Pub. Emps. Ret. Sys. v.*

*Bristol-Myers Squibb Co.,* 28 F.4th 343, 351–52 (2d Cir. 2022) (citing *Kleinman v. Elan Corp.*,

706 F.3d 145, 152 (2d Cir. 2013)). UPF contests the first two and the last elements: a material

misstatement or omission, scienter, and loss causation. *See* Mot. at 7. The Court first addresses

Defendants' alleged material omissions and finds that Plaintiffs have failed to allege, with

sufficient particularity, a misstatement or omission of material fact. Therefore, the Court need

not, and declines to, consider the parties' scienter and loss causation arguments. *See*

*Saskatchewan Healthcare Emps. Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 390

(S.D.N.Y. 2024) ("Because the failure to establish any element is fatal to a section 10(b)/Rule

10b-5 claim, the Court need not address Defendants' other arguments for the dismissal of the

Lead Plaintiff's Exchange Act claims." (internal citations and quotation marks omitted)); *Long*

*Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 796 (S.D.N.Y. 2020) (declining to address scienter or

loss causation after concluding that plaintiffs failed to allege an actionable misstatement or

omission).

To satisfy the first element of Section 10(b) claim, plaintiffs must plead both falsity and

materiality. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) ("To prevail on a §

10(b) claim, a plaintiff must show that the defendant made a statement that was *misleading* as to

a *material* fact." (internal citation and quotation marks omitted)). First, as to falsity, under the

PSLRA, "any private securities complaint alleging that the defendant made a false or misleading statement must . . . 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *Tellabs, Inc.*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u–4(b)(1)).

"The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) (citation omitted). "[W]hether a statement is 'misleading' depends on the perspective of the reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). "The inquiry (like the one into materiality) is objective, and it considers not only a statement's literal truth, but also the context and manner of presentation." *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 532–33 (S.D.N.Y. 2024) (internal citations and quotation marks omitted).

Second, as to materiality, "[a] misrepresentation is material under Section 10(b) . . . where there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (internal citation omitted) (cleaned up); *see also Matrixx Initiatives, Inc.*, 563 U.S. at 38  (finding that the materiality requirement "is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" (internal citations and quotation marks omitted)).

Here, the crux of Plaintiffs' amended securities fraud claim is that UPF failed to properly disclose the risk arising from its noncompliance with both New Zealand and Chinese securities laws. SAC ¶¶ 31, 46, 57, 69. In largely repetitious pleadings, Plaintiffs identify several

statements within UPF's 2019, 2020, 2021, and 2022 Annual Reports as "false or misleading." *Id*. The Court considers each statement identified by Plaintiffs, first addressing UPF's statements concerning its operations under New Zealand law and then its disclosures regarding compliance with Chinese law.

### a. UPF's Disclosures Regarding New Zealand

Plaintiffs allege that UPF's statements regarding its compliance with New Zealand's AML/CFT Act and the corresponding regulatory risks were false or misleading. *Id*. ¶¶ 31, 46, 57, 69.

First, Plaintiffs specifically identify UPF's representations in its 2019 Annual Report that:

- the FMA warnings did "not suggest that the businesses have allowed or enabled illegal activity to take place,"

- "[n]on-compliance with applicable laws or regulations could result in sanctions to be levied against us," and

- UPF "face[s] risks related to our status as an anti-money laundering reporting entity in New Zealand and if the Financial Markets Authority finds fault with our AMLCFT programs and engages in enforcement actions against us, our business and reputation may be adversely affected."

*Id*. ¶ 31 (cleaned up).

Next, Plaintiffs identify UPF's statements in its 2020 Annual Report that:

- "[f]ailure to comply with such laws and regulations may result in penalties, including rectification requirements, confiscation of illegal proceeds, fines or even shutting down of business," and

- "[i]f the FMA engages in enforcement actions against us, our business and reputation may be adversely affected."

*Id.* ¶ 46 (cleaned up).

Finally, Plaintiffs identify similar statements in UPF's 2021 and 2022 Annual Reports in which UPF disclosed that non-compliance with applicable laws "*could*" harm UPF's "business, reputation, financial condition and results of operations." *Id.* ¶¶ 57, 69.

All but one of these statements disclose the possibility of future enforcement action by the FMA. *Id.* ¶¶ 31, 46, 57, 69. These forward-looking statements use hypothetical language such as "could" and "may" to describe the risk of prospective sanctions and other regulatory consequences. *Id.* ¶¶ 31, 46, 57, 69. Plaintiffs allege that these statements obfuscate that the FMA had already determined that Tiger Brokers violated the AML/CFT Act. *Id.*

However, Plaintiffs misread these future-oriented statements. In their proper context, these statements refer to UPF's continued compliance with the FMA's remedial program, rather than UPF's compliance with the AML/CFT Act itself. *See* SAC ¶¶ 27–28, 41–44, 52–53, 67. All of UPF's conditional statements either (1) disclose the possibility of future enforcement actions resulting from UPF's failure to complete its remedial program, or (2) amount to general, non-actionable statements of the uncontroversial proposition that legal violations may lead to adverse consequences. *Id. See Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 726 F. Supp. 3d 315, 349 (S.D.N.Y. 2024) ("Read in context, these disclosures informed investors about the risks of financial loss that [defendant] faced if there was a failure to safeguard personal information. No reasonable investor would have interpreted such a warning to imply that [defendant] had never failed to safeguard personal information."). Therefore, none of these statements misleadingly suggest that UPF complied with the AML/CFT Act.

13

In fact, UPF fully and timely disclosed all actions and findings by the FMA. At the time of the 2019, 2020, and 2021 Annual Reports' filings, SAC ¶¶ 26, 40, 52, the FMA had not taken any enforcement action against UPF other than those that UPF described in its Annual Reports—the investigation, public warning, and subsequent remedial requirements, *id.* ¶¶ 28, 43 (disclosing the FMA's investigation, public warning, and Tiger Brokers' subsequent compliance with required remedial actions); UP Fintech Holding Ltd., Annual Report (Form 20-F), 52–53 (April 28, 2022),

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001756699/000156459022016241/tigr-20f_20211231.htm (same).

UPF's 2022 Annual Report similarly disclosed the FMA's civil High Court proceedings against Tiger Brokers for breach of the AML/CFT Act, stating that:

> Tiger Brokers (NZ) Limited and the FMA have agreed to a pecuniary penalty of NZ Dollar 900,000. The resolution requires formal proceedings to be filed in New Zealand High Court. On 21 December 2022, civil pecuniary penalty proceedings were filed by the FMA for allegedly breaching the Anti-Money Laundering and Countering Financing of Terrorism (AML/CFT) Act 2009 (the Act) on 21 December 2022 . . . . The court hearing was on 23 March 2023.

UP Fintech Holding Ltd., Annual Report (Form 20-F), 55 (April 26, 2023). Therefore, the statements Plaintiffs identify from UPF's Annual Reports were not false and misleading regarding the FMA's enforcement actions, particularly given UPF's explicit and comprehensive disclosures of the FMA proceedings. SAC ¶¶ 67–69.

Additionally, the caselaw Plaintiffs cite in their opposition is inapposite. *See* Opp. at 11–12. These cases all refer to risk disclosures that refer to future risk without disclosing that the risk had already transpired. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 165, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the

14

risk has transpired."). Here, as discussed, all materialized risks of New Zealand sanctions had been disclosed by UPF.

Regarding UPF's New Zealand operations, Plaintiffs identify only one other statement as false and misleading: UPF stated that the FMA warnings did "not suggest that the businesses have allowed or enabled illegal activity to take place." SAC ¶ 31. Plaintiffs argue that this statement is false and misleading because the FMA concluded that there were reasonable grounds to believe that UPF had contravened the AML/CFT Act. *Id.*

"When there is cautionary language in a disclosure," courts in the Second Circuit analyze "the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled." *Rombach*, 355 F.3d at 173 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)). "The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Id.*

Here, the statement that the FMA warnings did "not suggest that the businesses have allowed or enabled illegal activity to take place" is not false in its full context. SAC ¶ 31. When considered along with the explicit disclosure of the FMA enforcement action, there is only one reasonable interpretation of this language. As Defendants argue, this statement refers to whether illegal activity took place on Tiger Brokers' platform, not whether Defendants themselves engaged in illegal activity. Mot. at 8–9. Indeed, UPF's 2019 Annual Report already disclosed that "in April 2020, [the] FMA had issued a formal public warning, being of the opinion that [Tiger Brokers] had breached some of its AMLCFT obligations." SAC ¶ 28. A reasonable investor would not interpret UPF as contradictorily asserting that the FMA's warning both suggested a

15

breach of the AML/CFT Act, and that UPF did not violate any laws. *See id.* ¶¶ 28, 31. Rather, the 2019 Annual Report would be reasonably understood to disclose the AML/CFT Act breach, while confirming that Tiger Brokers' platform did not host illegal activity. *Id.* Even after drawing "all reasonable inferences in the [P]laintiffs' favor," Plaintiffs have failed to sufficiently plead with particularity that UPF's statement was false. Opp. at 15 (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

Finally, Plaintiffs' claims that "CW2," an anonymous Project Manager employed by Tiger Brokers in 2019, observed Tiger Brokers' "reckless" mismanagement of its New Zealand accreditation process, do not cure the SAC's failure to allege a material misrepresentation. SAC ¶¶ 38–39, 50, 62, 74. CW2 stated that prior to the FMA's investigation, Tiger Brokers' CEO sought to complete New Zealand accreditations on an "unrealistic[ally]" short timeline, without the funding or staff that the Project Manager "believed was necessary." *Id.* ¶ 39. "However, plaintiffs' use of confidential witnesses does not rectify the fact that they do not adequately plead falsity." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014), *aff'd,* 616 F. App'x 442 (2d Cir. 2015). While CW2 is "certainly able to muster a litany of criticisms," CW2's allegations support at most only an "inference [of] an oversight failure of management." *Id.*; *see* SAC ¶¶ 28, 38. In any event, in light of UPF's disclosure of the FMA's investigation and enforcement actions, CW2's statements do not undermine that UPF sufficiently disclosed the FMA's enforcement actions. *See* SAC ¶ 28.

Additionally, all of Plaintiffs' allegations that UPF failed to make sufficient disclosures related to the FMA's investigation fail, because the FMA's warning about UPF's violation of the AML/CFT Act and subsequent court proceedings were public. *Id.* ¶¶ 4, 63, 90. "Alleged misstatements are not material where the truth was fully disclosed or concerned a matter of

16

public knowledge." *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 553 (S.D.N.Y. 2021). Here, the FMA issued its public warning on April 6, 2020, publicly filed civil High Court proceedings on December 21, 2022, and the Auckland High Court publicly announced its order against Tiger Brokers on June 29, 2023. SAC ¶¶ 4, 63, 90.

Therefore, Plaintiffs fail to allege that UPF's disclosures regarding its conduct in New Zealand were material misrepresentations under Section 10(b).

### b.  UPF's Disclosures Regarding China

Although the SAC's new allegations focus on UPF's conduct in New Zealand, Plaintiffs also reassert that UPF's disclosures concerning its Chinese operations and regulatory risk were materially misleading. SAC ¶¶ 31, 46, 57, 69. Like in Plaintiffs' First Amended Complaint, Plaintiffs support their claims with allegations of news articles and confidential witnesses. *See, e.g.*, *id.* ¶¶ 35–39, 75–83. Much of what Plaintiffs identify as false and misleading are the same statements identified in the First Amended Complaint. *Compare* SAC ¶¶ 31, 46, 57, 69 *with* Am. Compl. ¶¶ 24, 26, 31, 33, 41, 43, 48, 52. And Plaintiffs reassert their allegations regarding CW1 and several *Wall Street Journal* and *Reuters* news reports that were also alleged in their First Amended Complaint. *Compare* SAC ¶¶ 35–37, 49, 61, 73 *with* Am. Compl. ¶¶ 55–57; *compare* SAC ¶ 75, 77, 79–80, 82 *with* Am. Compl. ¶¶ 58, 60, 62–63, 65.  Therefore, for largely the same reasons set forth in the Court's previous Order, Plaintiffs fail to allege the falsity of UPF's disclosures concerning its compliance with Chinese laws. Order at 11–16.

Plaintiffs did add allegations that they claim satisfy falsity; however, none of the new allegations cure the deficiencies the Court previously found. First, Plaintiffs allege in a conclusory manner that "the warnings from the FMA also rendered Defendants' statements [in its Annual Reports] regarding compliance with laws and regulations in China false and misleading

17

because Defendants were aware that the same conduct that subjected [UPF] to regulatory enforcement by the FMA also subjected [UPF] to regulatory enforcement in the PRC." SAC ¶¶ 5, 31, 46, 57, 69. However, Plaintiffs fail to explain why enforcement actions by a New Zealand agency against UPF's New Zealand subsidiary for breach of New Zealand law would necessarily subject UPF to similar regulatory enforcement by the Chinese government. Relatedly, Plaintiffs fail to allege facts establishing that UPF's conduct was the same in both New Zealand and China. Therefore, Plaintiffs have not sufficiently alleged that the FMA warning renders UPF's disclosures regarding compliance with Chinese law false.

Second, Plaintiffs point to the 2019 GeoInvesting Report to establish the falsity of UPF's disclosures. According to Plaintiffs, this report showed that UPF operated illegally in China, including failing to obtain proper licensing and encouraging customers to make fraudulent claims to Chinese banks. Opp. at 12–13 (citing SAC ¶ 40). However, short-seller reports like this raise reliability concerns, requiring "caution and care" as courts "critically analyze[] such attributions." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020); *see also Harris v. AmTrust Financial Services, Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015) (dismissing securities fraud claims when plaintiffs relied "almost entirely on a negative report published by [GeoInvesting,] a short seller"). Only "where courts have found that well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports, courts have sustained such complaints." *Id.* Here, the GeoInvesting Report is of limited reliability. Plaintiffs failed to allege any facts corroborating the GeoInvesting Report, and both parties identify its source as one anonymous "customer service rep." Mot. at 14–15; Opp. at 17.

Even taking the GeoInvesting Report as true, Plaintiffs fail to show that it proves any of UPF's statements false or misleading. Plaintiffs fail to specify which of UPF's statements are contradicted by the GeoInvesting Report. *See Tellabs, Inc.*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u–4(b)(1)) (stating that under the PSLRA, "any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'"). Rather, Plaintiffs generally plead that the GeoInvesting Report "demonstrates that the risks that Defendants claimed were mere possibilities had already materialized." SAC ¶ 6; *see also id.* ¶¶ 32, 47, 59, 71 (substantially identically pled).

Thus, Plaintiffs seem to allege that the GeoInvesting Report proves that UPF's risk disclosures understated the risk of its operations in China. *See, e.g.*, *id.* ¶¶ 27, 41–42. However, as discussed in the Court's prior Order, UPF disclosed its operations in China and its decision to not obtain certain licenses, which "sufficiently warned investors about the risks of their activities in China." Order at 11; *see also SAC* ¶¶ 40–41, 52–54, 64–66. The GeoInvesting Report did not render UPF's risk disclosures, as written, false. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) ("Corporations do not, as a general matter, have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" (internal citation and quotation marks omitted)).

Therefore, Plaintiffs have not alleged that UPF's disclosures of its regulatory risk in China were material misstatements under Section 10(b).

### c. Plaintiffs Fail to Identify Misstatements or Omissions in UPF's Press Releases

Furthermore, Plaintiffs fail to identify the falsity of UPF's various press releases regarding the resignation of UPF directors, UPF's public offering of ADS's, and policy changes

affecting UPF's Chinese clients. SAC ¶¶ 84–89; *see Tellabs, Inc.*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u–4(b)(1)) (stating that under the PSLRA, "any private securities complaint alleging that the defendant made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading'"). Under the header "Other Relevant Events," Plaintiffs describe various UPF press releases, but fail to actually allege that they are false or misleading. SAC ¶¶ 84–89. Therefore, Plaintiffs have failed to plead falsity of any of UPF's statements in its press releases.

### d. The Alleged Misstatements and Omissions in UPF's SOX Certifications Also Fail to State a Claim

Finally, like in their Amended Complaint, Plaintiffs argue that UPF's SOX certifications, in which UPF "attest[ed] to the accuracy of financial reporting, the disclosure of any material changes to [UPF's] internal controls over financial reporting, and the disclosure of all fraud," are false and misleading. SAC ¶¶ 30–31; s*ee also id.* ¶¶ 45, 56, 68. As stated in the Court's previous Order, because Plaintiffs fail "to adequately plead an actionable misstatement or omission regarding the Annual Reports, Plaintiff[s'] claim based on the SOX certifications necessarily fails." Order at 16 (citing *In re Glob. Brokerage, Inc.*, No. 17-CV-916 (RA), 2019 WL 1428395, at *14 (S.D.N.Y. Mar. 28, 2019); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017)). Therefore, Plaintiffs have failed to state a claim for securities fraud under Section 10(b).

## II.    Plaintiffs' Section 20(a) Claims Fail as a Matter of Law

As discussed in the Court's previous Order, Section 20(a) claims are predicated on a primary violation of securities law. Order at 16–17. Because Plaintiffs have failed to allege a primary violation under Section 10(b), Plaintiffs' control person liability claims under Section

20(a) also fail. *See* Order at 17 (quoting *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 656 (S.D.N.Y. 2015)).

**CONCLUSION**

For the reasons stated herein, the motion to dismiss is GRANTED. Plaintiffs' claims are dismissed with prejudice. The Clerk of Court is respectfully directed to terminate ECF No. 90 and close this case.

Dated: March 26, 2026
      White Plains, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge

21